IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 105,148

STATE OF KANSAS,
*Appellee*,

v.

LEONARD D. CHARLES, SR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

The giving of a lesser included offense instruction that is overbroad when compared with the State's charged theory of the case is error. In this case, however, the overbroad jury instruction did not qualify as clear and therefore reversible error under K.S.A. 22-3414(3).

2.

Reckless aggravated battery is not an alternative means crime.

3.

On the record in this case, the evidence in support of defendant's conviction for reckless aggravated battery was sufficient.

4.

A prosecutor's repeated use of the phrase "I think" or its equivalent or substantive opposites is discouraged as susceptible to interpretation as expression of improper and irrelevant opinion on the quantity and quality of evidence. However, in this case, the use

1

of the phrase appears to have been a verbal tic or time filler and did not fall outside the wide latitude given the prosecutor in discussing the evidence during closing argument.

5.

Evidence of defendant's other behavior during the time and at the place of commission of a charged crime does not qualify as other crime evidence subject to K.S.A. 60-455, and no limiting instruction on the evidence of the other behavior is needed.

6.

The cumulative error doctrine is inapplicable when a single error is identified on appeal.

7.

The registration requirement for violent offenders under the 2009 version of the Kansas Offender Registration Act imposed upon the defendant in this case qualified as punishment under the Due Process Clause. It could not constitutionally be imposed based on judicial, rather than jury, factfinding.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 15, 2012. Appeal from Sedgwick District Court; DAVID J. KAUFMAN, judge. Opinion filed April 22, 2016. Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, former district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

*Per Curiam*:  This is the direct appeal of defendant Leonard D. Charles, Sr., from his jury convictions and sentence for reckless aggravated battery, felony criminal damage to property, and criminal threat based on a series of incidents that occurred on Christmas 2009. The district judge sentenced Charles to 34 months' imprisonment and required him to register as a violent offender under the Kansas Offender Registration Act (KORA).

On appeal to our Court of Appeals, Charles raised six issues challenging his convictions and the registration requirement. The Court of Appeals affirmed. Charles raises the same six issues on petition for review to this court. For the reasons detailed in the discussion section below, we affirm his convictions and vacate his registration requirement.

FACTUAL AND PROCEDURAL BACKGROUND

Late in the evening on Christmas 2009, Charles drove his 1995 Nissan Pathfinder 4x4 SUV into a Family Video parking lot in Wichita. Charles was on his way to Kansas City to see his mother because he had heard from his brother that she was scheduled to have open heart surgery soon. Charles would eventually testify that he had become lost and had mistaken the Family Video for a gas station.

Autumn McDowell had just finished returning a video at the store when her car became stuck in snow near the parking lot exit. As Charles pulled into the parking lot, he saw McDowell in her vehicle. McDowell and Charles would later provide different accounts of the nature of their subsequent interaction.

According to McDowell, when Charles pulled up, he asked if she needed assistance. McDowell told him that she was going to try to rock her car back and forth to

3

free it. During this brief conversation, a driver in a car that had been behind McDowell began to honk, seemingly unaware that McDowell's car was stuck. Charles got out of his SUV, approached the third vehicle, and started yelling at the driver. The third vehicle then left. Charles reentered his SUV and positioned it behind McDowell's car. At that point, McDowell was able to rock her car free, and she drove out of the parking lot. When McDowell looked into her rearview mirror, she saw that Charles was following her in his SUV. McDowell sped up to 60 miles per hour "to get away from him," before she turned into a residential neighborhood.

Once in the neighborhood, McDowell drove evasively, "going from street to street, in and out, just trying to lose [him]." At one point, McDowell turned off her headlights to avoid Charles' detection, but she quickly turned them back on because she could not see. Minutes after the pursuit began, Charles rear-ended McDowell's car, sending both vehicles over a curb. McDowell was "really scared," "felt threatened," and "was in a panic 'cause I didn't know what he wanted with me, why he was following me." After the collision, McDowell believed Charles' SUV was stuck on the curb. She then drove home and called 911. McDowell suffered whiplash in the collision, and her car sustained nearly $4,000 in damage.

According to Charles, he entered the Family Video parking lot, saw McDowell in her car, lowered his window, and asked her if she could give him directions. McDowell agreed to do so. Charles then got out of his SUV and showed her a piece of paper that had written directions on it. McDowell apparently told Charles how he could return to his route and get to Kansas City. At that point, McDowell told Charles that her car was stuck, and he agreed to help her by pushing her car with his SUV. Charles also said that the two talked about exchanging phone numbers and that McDowell directed him to follow her to her parents' house in a nearby neighborhood.

4

Charles pulled up behind McDowell and used his SUV to push her car free of the snow. He then stepped out of his SUV to inspect it for damage and watched as McDowell "mashed the gas" and sped away. Charles got back into his vehicle and drove in the direction he saw McDowell drive away, and he eventually followed her into a residential neighborhood.

Charles said that he did not see McDowell's car when he entered the neighborhood. He did, however, see a car with its lights off, which appeared to be parking. Figuring the parking car contained McDowell, Charles sped up to see better. When his SUV's headlights illuminated the parking car's interior, he saw McDowell, "and she had this surprised look on her face like, [']Oh, my God, he found me.[']"

According to Charles, McDowell then turned her headlights back on and "sped off again." Charles followed. As the pursuit continued, Charles began to question whether McDowell did in fact want him to follow her. "The wheels start[ed] clicking," he said, and, "I began to think like is she—is she running?"

Nevertheless, Charles said he wanted to make contact with McDowell to determine whether she did not want him to follow her. Shortly thereafter, McDowell's vehicle began "fishtailing and sliding"; Charles slammed on his brakes, causing his SUV to skid before colliding with McDowell's vehicle. Charles characterized the accident as unavoidable.

After the collision, Charles returned to Family Video, where Rachel Northrup and Kailey Westemeir were working inside. Both Northrup and Westemeir testified at Charles' trial.

When Charles entered Family Video, Northrup was helping customers from behind the counter while Westemeir checked inventory at the back of the store. Northrup did not see Charles enter the store, but she noticed him when he approached the counter. Charles was "pacing and raising his voice" and generally looked frustrated and upset. Charles continued to get louder, saying there was something wrong with his SUV. He then said that, if he could not get to Kansas City to see his mother before she died, he was going to come back to the store and kill someone.

Charles then came behind the counter and approached Northrup face-to-face, making similar statements about killing someone if he was unable to get to Kansas City before his mother died. At some point, Charles "took a big swipe" and knocked over a computer monitor that had been attached to the counter. He also knocked over a gift card display and a cup of pens and pencils that were on the counter, and he knocked several videos off the store's shelves.

Westemeir heard the commotion in the front of the store and came toward the counter from the back. Charles approached her and began yelling about "some girl who messed up his car." Westemeir eventually called 911. While she was on the phone with the 911 operator, Charles told her that if he could not get to Kansas City to see his dying mother, "he was gonna come back and kill us."

When police arrived at Family Video, they arrested Charles.

As a result of all of these events, the State charged Charles with three counts: intentional aggravated battery, alleging Charles "unlawfully and intentionally cause[d] bodily harm to another person . . . with a deadly weapon, to-wit: 1995 Nissan Pathfinder"; criminal damage of McDowell's car; and criminal threat toward Westemeir.

6

At trial, in addition to giving an intentional aggravated battery instruction telling the jury it could convict if Charles caused bodily harm to McDowell with his SUV, the district judge informed the jury of the circumstances under which it could convict Charles of reckless aggravated battery as a lesser included offense. Charles did not object to the giving of the lesser included offense instruction, which read:

> "If you do not agree that the defendant is guilty of aggravated battery intentional, you should then consider the lesser included offense of aggravated battery reckless.
>
> "To establish this charge, each of the following claims must be proved:
>
> "1. That the defendant recklessly caused bodily harm to another person with a deadly weapon, to-wit: a car, *or in any manner whereby great bodily harm, disfigurement or death can be inflicted*; and
>
> "2. That this act occurred on or about the 25th day of December, 2009, in Sedgwick County, Kansas." (Emphasis added.)

During the first portion of the State's closing argument, the prosecutor prefaced many of his statements with the phrase "I think" or similar, personalized wording:

- Discussing Charles' statement that he was going to kill someone, "I don't believe that there's anything that you can consider the word 'kill' to mean other than to inflict physical harm to another person. I think that's the only way you can look at what those words mean."

- Discussing certain elements of criminal threat, "I think you're not gonna have a problem. . . . I don't think you have to worry yourselves with the rest of the elements. I think the defendant himself told you, I committed this crime."

- Discussing aggravated battery, "I think the evidence shows you beyond a reasonable doubt . . . 'the defendant intentionally caused bodily harm to another person with a deadly weapon, to wit:  a car.' . . . I think the car is a deadly weapon in this—in this case."

- Discussing the bodily harm element of aggravated battery, "[Bodily harm] doesn't have to be great, only bodily. I would say her neck and her back are her body. I think that's evident. She suffered harm."

- Discussing McDowell's reaction to Charles following her, "I don't think she was overreacting. I think she had every right to be scared from the minute she left Family Video."

- Discussing Charles' testimony that McDowell provided him directions, "I don't think so. I think what happened is—is he's and that's what the evidence shows is that he continued to pursue her 'cause he's gonna hook up with her."

- Discussing Charles' testimony about second-guessing whether McDowell wanted him to follow her, "Yeah, ladies and gentlemen, I think that was pretty clear from her testimony. She had absolutely no want or will for him."

- Discussing whether Charles' vehicle could be a deadly weapon, "His Nissan Pathfinder SUV, given the fact he thought he himself may have killed her, I'd say that that's a deadly weapon."

8

• Wrapping up, "I don't think there's really anything else to explain to you. I think that his evidence he showed you yesterday told you everything you needed to know about what he was trying to do."

During the rebuttal portion of the State's closing argument, the prosecutor again employed at least one personalized expression. Discussing a defense contention that the roads were snow-covered and slippery, he said: "Now, defendant would lead you to believe that the pieces to the vehicles just coincidentally landed on the only two dry pieces of the road. I doubt it."

The jury found Charles guilty of the lesser included offense of reckless aggravated battery, criminal damage to property, and criminal threat. In addition to receiving a 34-month prison sentence, Charles was ordered to register as a violent offender because the district judge found that he used a deadly weapon in the commission of a felony.

Charles asserts on appeal that (1) the lesser included offense instruction for reckless aggravated battery was impermissibly broader than the greater offense charged; (2) the reckless aggravated battery instruction allowed for a conviction under alternative means, and the State failed to prove each means beyond a reasonable doubt; (3) the district judge erred by failing to provide a limiting instruction on statements Charles made to Northrup; (4) the prosecutor committed misconduct by injecting his personal opinion of the evidence into the proceedings; (5) cumulative error denied Charles a fair trial; and (6) the district judge erred by requiring Charles to register under the Kansas Offender Registration Act.

9

DISCUSSION

*Breadth of Lesser Included Instruction*

Charles' first claim on appeal centers on the lesser included reckless aggravated battery instruction, which permitted conviction if the jury found beyond a reasonable doubt that Charles recklessly caused bodily harm to McDowell with his SUV or "in any manner whereby great bodily harm, disfigurement or death can be inflicted." The charging document had accused Charles only of the greater offense of intentionally causing bodily harm to McDowell with his SUV, and the jury instruction on the greater charge mirrored the more limited language.

Because Charles did not object at trial to the giving of the reckless aggravated battery instruction as worded to include the "in any manner" language, we look to K.S.A. 22-3414(3)'s clear error standard and to our caselaw to supply the template for our review of this issue.

When analyzing jury instruction issues, we follow a three-step process:

"(1) determining whether the appellate court can or should review the issue, *i.e.,* whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.,* whether the error can be deemed harmless." *State v. Williams,* 295 Kan. 506, 510, 286 P.3d 195 (2012).

"Our first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015).

10

At the second step of determining whether there was any error at all, we consider whether the subject instruction was legally and factually appropriate. See *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015). A reviewing court "'should use an unlimited review to determine whether the instruction was legally appropriate.'" *State v. Brownlee*, 302 Kan. 491, 511, 354 P.3d 525 (2015) (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]). When analyzing whether the instruction is factually appropriate, "the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction." *Brownlee*, 302 Kan. at 511 (quoting *Plummer*, 295 Kan. 156, Syl. ¶ 1).

If the reviewing court determines that the district judge erred in giving or failing to give a challenged instruction, it then moves to reversibility, which in this case is whether the challenged instruction was clearly erroneous. To determine if an instruction is clearly erroneous, "the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶ 5.

"'A jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous.'" *State v. McClelland*, 301 Kan. 815, 828, 347 P.3d 211 (2015) (quoting *State v. Trautloff*, 289 Kan. 793, Syl. ¶ 4, 217 P.3d 15 [2009] [wording of complaint binding on State in pursuing its theory of case before a jury]); see *State v. Haberlein*, 296 Kan. 195, 210, 290 P.3d 640 (2012) (State bound by complaint's "version of offense," "theory" of case at trial). "An overbroad instruction is erroneous because the charging instrument sets out the specific offense alleged to inform the defendant of the nature of the accusation, to permit the development of a defense to meet that accusation, and to protect against conviction based on facts not contemplated in the accusation." *State v. Hart*, 297 Kan. 494, 508, 301 P.3d 1279 (2013) (citing *Trautloff*, 289 Kan. at

11

802-03); see also *United States v. Miller*, 471 U.S. 130, 144, 105 S. Ct. 1811, 85 L. Ed. 2d 99 (1985) (additions to State's indictment theory by way of jury instruction impermissible under modern criminal law).

In *Hart*, we concluded that a jury instruction on the elements of indecent liberties with a child was overbroad because the complaint alleged defendant Randy Dean Hart committed the subject crimes with an intent to satisfy his own sexual desires, while the elements instruction provided that the State could get a conviction if the crimes were committed with an intent to arouse or satisfy the sexual desires of the victim, the defendant, or both. See 297 Kan. at 501. Accordingly, the instruction was neither legally nor factually appropriate and thus was erroneous. See 297 Kan. at 508. In this case, the Court of Appeals reached the same conclusion about the lesser included instruction. See *State v. Charles*, No. 105,148, 2012 WL 2325877, at *3 (Kan. App. 2012) (unpublished opinion). And we agree on this point.

We acknowledge that this case differs from *Hart* because the elements instruction under examination for impermissible overbreadth in that case defined the charged crime. Here we are concerned with the elements instruction for a lesser included crime. But this is a distinction without a legally significant difference. The element that made the aggravated battery lesser here—that is, a severity level 8 rather than a severity level 7— was the lesser scienter or mens rea of recklessness instead of intentional conduct. A Kansas criminal defendant is always on notice that the State may seek or the district judge be otherwise compelled to give a lesser included instruction involving the same conduct or actus reus described in the complaint but driven by a less culpable or more expansive mental state easier for the State to prove. See *State v. Ramirez*, 299 Kan. 224, 227-28, 328 P.3d 1075 (2014) (conviction of defendant on charge not contained in complaint clear violation of due process; exception allowed when district judge gives lesser included instruction, instruction on lesser degree of offense); K.S.A. 22-3414

12

(statute requires district judge to instruct on crime charged, any lesser included crime when "there is some evidence which would reasonably justify a conviction of some lesser included crime"). Charles does not challenge the giving of the reckless aggravated battery instruction because of its more expansive recklessness mental state. He challenges it only because of the increased breadth of the actus reus, when compared with the actus reus specified in the charged offense.

Courts in several of our sister states have recognized that a lesser included offense instruction may not be a vehicle for broadening the State's theory of the case. See *Andrews v. State*, 679 So. 2d 859, 859 (Fla. Dist. App. 1996) (defendant convicted of aggravated battery, lesser included offense of charged attempted first-degree murder; information alleged defendant stabbed victim with knife; lesser included offense instruction allowed conviction for use of deadly weapon or for causing great bodily harm; great bodily harm theory unsupported by charging document); *People v. Adams*, 202 Mich. App. 385, 392, 509 N.W.2d 530 (1993) (notice to defendant inadequate when State attempts to add lesser included offense instruction on crime dissimilar to charged offense); *People v. Russell*, 147 A.D.2d 280, 283, 543 N.Y.S.2d 54 (1989) ("so-called lesser included offense" represented "seismic shift" in prosecution's theory; defendant denied due process).

The Texas Court of Appeals' opinion in *Castillo v. State*, 7 S.W.3d 253 (Tex. App. 1999), is particularly illustrative of the problem here.

In *Castillo*, the State charged defendant Julian Antonio Castillo with "intentionally and knowingly caus[ing] serious bodily injury to [a child victim] by then and there striking the child with a deadly weapon, to wit:  the defendant's hands or by striking the child's head against a deadly weapon, to wit:  a wall or a floor." 7 S.W.3d at 255. At the conclusion of the guilt stage of trial, the defense sought a jury instruction on the lesser

13

included offenses of recklessly causing injury to a child. The trial judge instructed the jury that it could find Castillo guilty of the lesser included offense if it determined that he "recklessly engage[d] in conduct that caused serious bodily injury to [child victim] by then and there *shaking* or striking the [victim] with a deadly weapon, to wit:  the defendant's hands, or by striking the child's head with a deadly weapon, to wit:  a wall or floor." 7 S.W.3d at 257. The jury convicted Castillo of recklessly causing injury to the child.

The appellate court reversed Castillo's conviction because the lesser included offense instruction "submitted the theory of 'shaking' in the disjunctive as an additional manner and means of injuring the child to those means alleged in the indictment." 7 S.W.3d at 257. Although the State had not been required to "plead the precise way in which [Castillo] caused serious bodily injury to the child, . . . [b]y including a more specific description, the State undertook the burden of proving the specific allegations to obtain a conviction. [Citation omitted.]" 7 S.W.3d at 255.

We are confronted with exactly the same situation. The State was not required to be as specific as it was in its aggravated battery charge against Charles. It need not have alleged that Charles committed severity level 7 intentional aggravated battery only by causing bodily harm to McDowell by using his SUV as a deadly weapon. But, having chosen that path, it assumed the burden of proving the elements of exactly it or its lesser included reckless version beyond a reasonable doubt. The district judge erred by expanding the lesser included instruction so that Charles could be convicted if the jury found beyond a reasonable doubt that he inflicted bodily harm on McDowell "in any manner whereby great bodily harm, disfigurement or death can be inflicted." The lesser included offense instruction was neither factually nor legally appropriate.

14

Having determined that there was instruction error, we must next determine whether it was "clear" and therefore reversible, standing alone. See K.S.A. 22-3414(3); *Hart*, 297 Kan. at 508 (citing *State v. Trujillo*, 296 Kan. 625, 630-31, 294 P.3d 281 [2013] [in order for overbroad instruction to qualify as "clearly" erroneous, court must be firmly convinced that jury would have reached different verdict had instruction error not occurred]).

In his petition for review, Charles asked this court to "grant review and clarify that where, as here, an instruction is overbroad and allows a jury to convict a defendant based on uncharged conduct, an appellate court should reverse so long as there [] is a 'possibility' that [jury reliance on the uncharged theory] cannot be ruled out." Although language to this effect may appear in *Trautloff*, see 289 Kan. at 802, it is not the correct governing standard under *Trujillo* or here. Again, because Charles failed to object to the wording of the reckless aggravated battery instruction, he must demonstrate that the error on the overbroad instruction was clear under K.S.A. 22-3414(3).

Evidently because neither the Court of Appeals brief nor the petition for review filed by Charles fully explained why Charles deserved reversal on this instructional error standing alone, his counsel attempted to flesh out his position at oral argument before this court. We understood counsel to assert that the definition of "deadly weapon" as an "instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury," see PIK Crim. 4th 54.310; *State v. Colbert*, 244 Kan. 422, 426, 769 P.2d 1168 (1989), makes it logically inconsistent with the concept of recklessness. Further, if Charles' conviction on severity level 8 aggravated battery would have been legally impermissible because of this logical inconsistency, then the jury must have relied upon the overbroad and impermissible "in any manner" theory. If so, counsel argued, then any standard of reversibility has been met.

15

In *Hart*, we discussed our earlier decisions in *Trautloff* and *State v. Wade*, 284 Kan. 527, 161 P.3d 704 (2007):

"In *Trautloff*, decided before our recent clarification of the clearly erroneous standard in *Trujillo*, we reversed one of the defendant's convictions for sexual exploitation of a child because of overbreadth of a jury instruction on the crime's elements. The State had charged Melvin Trautloff with 'displaying' an offending photograph or video of a child, but the instruction allowed the jury to convict Trautloff of 'displaying, procuring or producing' such a photograph or video. At Trautloff's trial, the evidence of 'procuring' or 'producing' was direct and overwhelming, while the evidence of 'displaying' was minimal and circumstantial. We concluded that, under those circumstances, Trautloff's substantial rights had been prejudiced by the instruction. *Trautloff*, 289 Kan. at 802-03.

"Likewise, in *State v. Wade*, 284 Kan. 527, 161 P.3d 704 (2007), the State charged Morgan Wade with aggravated burglary without alleging the intended felony upon which the charge was predicated. It cured this defect by advising the court and defense that it intended to rely upon first-degree premeditated murder as the underlying felony. At trial, however, after the defendant had testified, the jury was instructed that the underlying felony could be premeditated murder or aggravated assault. On appeal, this court concluded that the broader jury instruction prejudiced Wade because the State had proceeded in its case-in-chief only on the theory that Wade intended to commit premeditated murder; the alternate theory that he lacked premeditated intent to kill and meant only to frighten surfaced only after he had essentially admitted during his testimony that he committed an aggravated assault. *Wade*, 284 Kan. at 537." *Hart*, 297 Kan. at 508-09.

We distinguished *Trautloff* and *Wade* from the situation before us in *Hart*. In *Hart*, we detected no reversibly prejudicial lack of notice to the defense about the accusation to be defended. In that aggravated indecent liberties case,

16

"[t]here was no evidence presented by either side that would suggest Hart's conduct was responsive to the victims' desires. Hart was not lured into presenting a defense that sealed a conviction on an alternate State theory that the girls had initiated or provoked the sexual contact. Rather, he generally denied that any sexual contact took place, and his testimony merely suggested motives for the victims or his ex-wife to fabricate the allegations against him. This was not, as in Wade's case, 'trial by ambush,' *Wade*, 284 Kan. at 541, and the error in the instruction does not qualify as clearly erroneous or require reversal." *Hart*, 297 Kan. 509-10.

In this case, we disagree with the underlying premise of defense counsel's reversibility argument. This court's use of the word "calculated" in the definition of "deadly weapon" does not mean a jury in an aggravated battery case involving an allegation of use of a deadly weapon must answer a subjective question: Did the defendant actually believe that he or she was using an instrument in a way that made that instrument deadly? Rather, the jury must answer an objective question: Would a reasonable person in defendant's circumstances have believed that? Put another way, was it likely the instrument would be deadly, when used in the way and at the time and place it was used by defendant? See *State v. Whittington*, 260 Kan. 873, 878, 926 P.2d 237 (1996).

In our view, these objective questions are logically consistent, not inconsistent, with the concept of recklessness as the required mens rea for severity level 8 aggravated battery. Reckless conduct is "conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." See K.S.A. 21-3201(c). Again, an objective standard is employed. If a defendant engages in behavior that is a gross deviation from the standard of care a reasonable person would employ in like circumstances, then the necessary disregard is demonstrated. See PIK Crim. 4th 52.010.

17

We conclude that this case is closer to *Hart* than to *Trautloff* and *Wade*. Charles was not misled by the original narrow charge into a failure to challenge the State's case or into commitment to a losing defense strategy. His counsel's argument that the jury must have relied on the impermissible, overbroad theory of the lesser included offense is unconvincing, given the objective nature of the definitions of deadly weapon and recklessness. Charles has not met his burden to demonstrate that he is entitled to reversal of his aggravated battery conviction on this issue, standing alone. The error does not qualify as clear. See *Williams*, 295 Kan. 506, Syl. ¶ 5.

*Sufficiency of the Evidence on Asserted Alternative Means*

Charles argues that reckless aggravated battery is an alternative means crime and that the State failed to prove either alleged means.

"Issues of statutory interpretation and construction, including issues of whether a statute creates alternative means, raise questions of law reviewable de novo on appeal." *State v. Brown*, 295 Kan. 181, Syl. ¶ 6, 284 P.3d 977 (2012).

In *State v. Ultreras*, 296 Kan. 828, 253-54, 295 P.3d 1020 (2013), we held that K.S.A. 21-3414(a)(2)(B) ("recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted"), does not outline an alternative means crime. We therefore reject Charles' argument insofar as it relies on classifying aggravated battery as an alternative means crime.

That being said, we must still address Charles' assertion that the State failed to prove either of the alleged alternatives. This is equivalent to a challenge to the sufficiency of the evidence to support the conviction.

18

"When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 8, 245 P.3d 1030 (2011)." *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014).

In this case, testimony established that Charles followed McDowell closely while traveling at high speeds through a residential neighborhood. Charles admitted that the wintry road conditions were far from ideal, and it is undisputed that the collision between his SUV and McDowell's car caused thousands of dollars in property damage and injured McDowell. From the manner in which Charles was driving his vehicle, a reasonable jury could have found either that the SUV qualified as a deadly weapon or that Charles' use of it was likely to produce death or serious injury. See *Whittington*, 260 Kan. at 878-79 (automobile may be used as deadly weapon); *State v. Bailey*, 223 Kan. 178, 184, 573 P.2d 590 (1977) (automobile constituted deadly weapon); *State v. Bradford*, 27 Kan. App. 2d 597, 600, 3 P.3d 104 (2000) (automobile used in deadly manner "could very well have been a deadly weapon" supporting conviction for reckless aggravated battery). There was sufficient evidence to support Charles' conviction for reckless aggravated battery.

*Prosecutorial Misconduct*

Charles next contends that he was deprived of a fair trial by the prosecutor's repeated statements of personal opinion on the quality and quantity of the State's

evidence. Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis.

> "First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial." *State v. Lewis*, 299 Kan. 828, 848, 326 P.3d 387 (2014) (citing *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 [2013]).

> "Appellate courts consider three factors in analyzing the second step: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. But none of these factors individually controls; and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *State v. McCullough*, 293 Kan. 970, 990-91, 270 P.3d 1142 (2012).

> "When both constitutional and nonconstitutional errors clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the constitutional error. If the constitutional error is reversible, an appellate court need not analyze whether the lower standard for harmlessness under K.S.A. 60-261 also has been met. *Bridges*, 297 Kan. 989, Syl. ¶ 16. Under both standards, the party benefiting from the error bears the burden to demonstrate harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013)." *Lewis*, 299 Kan. at 848-49.

Charles identifies more than a dozen of the prosecutor's closing argument comments, most of which include the phrase "I think" or its equivalent or their substantive opposites.

We are troubled by these comments, because, in short, the prosecutor's personal views are irrelevant to the task before the jury. And, in some circumstances, such views can be a legally significant distraction outside the wide latitude permitted prosecutors when discussing the evidence during closing argument. See *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014) (wide latitude does not extend to prosecutor's personal opinion). For example, we have had little hesitation in labeling prosecutors' statements about their personal views on witness credibility misconduct. See *State v. Armstrong*, 299 Kan. 405, 429, 324 P.3d 1052 (2014). Similarly, a prosecutor should not express personal opinions on the ultimate guilt or innocence of the defendant. *State v. Mireles*, 297 Kan. 339, 368, 301 P.3d 677 (2013). The reason for prohibiting such comments is that they constitute a form of unsworn, unchecked testimony, not commentary on the evidence of the case. *Armstrong*, 299 Kan. at 429; *Mireles*, 297 Kan. at 368. "Nevertheless, a prosecutor has '"freedom . . . to craft an argument that includes reasonable inferences based on the evidence"' and '"when a case turns on which version of two conflicting stories is true, [to argue] certain testimony is not believable. [Citations omitted.]"'" *Armstrong*, 299 Kan. at 427. A prosecutor may also argue that the evidence demonstrates a defendant's guilt. *Mireles*, 297 Kan. at 368. In so doing, a prosecutor must "say something akin to 'the evidence shows defendant's guilt' in order to make a statement merely directional and not an expression of the prosecutor's personal opinion." *State v. Peppers*, 294 Kan. 377, 400, 276 P.3d 148 (2012); see *State v. Mann*, 274 Kan. 670, 688-89, 56 P.3d 212 (2002) (distinguishing between permissible comment that sets up "prosecutor's upcoming summation" and impermissible "prosecutorial vouching").

We recognize that the Court of Appeals has ruled that the phrase "I think" makes a prosecutor's closing argument susceptible to a misconduct challenge. See *State v. Haugland*, No. 105,218, 2012 WL 1450440, at *2 (Kan. App. 2012) (unpublished opinion) (use of "I think" in extemporaneous comments made them susceptible to defendant's argument that prosecutor stated personal opinion on credibility); see also

*State v. Syers*, No. 107,051, 2013 WL 1234192, at *7 (Kan. App. 2013) (unpublished opinion) (prosecutors use of "I think" improper, inserted personal opinion of defendant's guilt); but see *State v. Rivera*, 42 Kan. App. 2d 1005, 1021-22, 219 P.3d 1231 (2009) (terms "I believe," "I think" often figure of speech, not expression of personal knowledge), *rev. denied* 290 Kan. 1102 (2010). This court has recently emphasized the use or lack of use of the phrase "I think." See *State v. Williams*, 299 Kan. 911, 935, 329 P.3d 400 (2014) (no prosecutorial misconduct, noting absence of phrase "I think" when prosecutor discussed witness credibility); *State v. Hart*, 297 Kan. 494, 501, 301 P.3d 1279 (2013) (emphasizing use of "I think," "I believe" in analysis of prosecutorial misconduct on discussion of witness credibility). Ultimately, however, we must view the phase "I think" not in isolation but in context. See *State v. Duong*, 292 Kan. 824, 831, 257 P.3d 309 (2011); see also *State v. De La Torre*, 300 Kan. 591, 612, 331 P.3d 815 (2014) (statement occupying "middle ground" between impermissible opinion and permissible directional statement not improper in context of argument that followed).

Here, at oral argument, the State encouraged us to view the prosecutor's use of "I think" as a rhetorical device. This characterization is inapt and does an injustice to true rhetoric. Rather, on repeated reading in context, we are convinced that the "I thinks" littering the transcript in this case are mere verbal tics—transitions and time fillers akin to "um" or "uh." As such, we hold that they were not outside the wide latitude given the prosecutor. But, in the future, prosecutors are on notice that any temptation to say "I think" should be rebuffed and replaced with "the evidence shows" or "I submit" or a similar, less potentially subjectively loaded phrase. See *State v. Corbett*, 281 Kan. 294, 316, 130 P.3d 1179 (2006) (phrase "I/we submit" used to advance idea for jury's consideration rather than expressing a personal opinion).

Because we ultimately conclude that there is no error on this issue, we need not reach the question of whether any error was harmless.

*Need for Limiting Instruction*

Charles argues that Northrup's testimony about comments he made to her moments before he made comments to Westemeir constituted "prior bad act evidence" that required a limiting instruction under K.S.A. 60-455 to guide the jury's consideration of the testimony. The district judge did not give such an instruction.

The Court of Appeals panel regarded this issue as unpreserved because admission of the evidence was not contested at trial. We have recently rejected this view. See *State v. Breeden*, 297 Kan. 567, 583, 304 P.3d 660 (2013). The clearly erroneous standard applies. See K.S.A. 22-3414(3).

"K.S.A. 60-455 does not prohibit the admission of evidence regarding other crimes and civil wrongs if the evidence relates to acts committed as part of the events surrounding the crimes or civil wrongs at issue in the trial." *State v. King*, 297 Kan. 955, Syl. ¶ 1, 305 P.3d 641 (2013). Northrup's testimony was limited to statements Charles made during his short time inside the video store. The statements were not made on a separate occasion and were not subject to K.S.A. 60-455. See *King*, 297 Kan. at 963-64. A limiting instruction was not legally or factually appropriate, and there was no error in failing to give one. See *State v. Williams*, 299 Kan. 509, 553, 324 P.3d 1078 (2014).

*Cumulative Error*

Charles argues that cumulative error requires reversal of his convictions. We judge the application of the doctrine by reviewing the entire record and engaging in an unlimited review. *State v. Cruz*, 297 Kan. 1048, 1074, 307 P.3d 199 (2013).

23

"In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. [Citation omitted.] In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial?" *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

We have identified only one error, the overbroad elements instruction on reckless aggravated battery. With no other error identified, cumulative error analysis is not applicable. See *State v. Bowen*, 299 Kan. 339, 359, 323 P.3d 853 (2014); *State v. Frierson*, 298 Kan. 1005, 1020, 319 P.3d 515 (2014).

*Registration Requirement*

In this case, the district judge determined that Charles' commission of aggravated battery employing a deadly weapon demanded his registration as a violent offender under the Kansas Offender Registration Act, K.S.A. 22-4901 *et seq.* Charles challenges the constitutionality of the Act, specifically its requirement for judicial factfinding, under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The constitutionality of a statute presents a question of law over which this court has unlimited review. *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014).

We have not previously considered this precise issue, but its general contours are straightforward. If KORA registration does not constitute punishment for purposes of the Due Process Clause of the Fourteenth Amendment, then *Apprendi* does not apply. If it does constitute punishment under that clause, then *Apprendi* applies and the Sixth Amendment demands that all factfinding in support of a registration requirement must be done by a jury, not a judge. See *Alleyne v. United States*, 570 U.S. __, 133 S. Ct. 2151, 2161, 186 L. Ed. 2d 314 (2013); *Apprendi*, 530 U.S. at 490.

In *Doe v. Thompson*, 304 Kan. ___, ___ P.3d ___ (No. 110,318, this day decided), a majority of this court, as of the time of the argument in this case, holds that retroactive application of KORA, as amended in 2011, to a sex offender who committed his or her sex crime before the amendment violates the Ex Post Facto Clause of the United States Constitution. This is so because that majority regards the overall KORA statutory scheme, effective as of July 1, 2011, as punitive in effect as it relates to sex offenders. See *Doe v. Thompson*, slip op. at 30-44 (applying "intent-effects" test from *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 [2003]).

The *Doe v. Thompson* decision informs the *Apprendi* analysis here. See Terry & Furlong, Sex Offender Registration and Community Notification: A "Megan's Law" Sourcebook, Part I, sec. 2.1 (2nd ed. 2008-2009) (noting many courts have held that if a particular sanction constitutes punishment under one constitutional basis, it constitutes punishment under other constitutional bases as well).

Charles committed his crime on December 25, 2009. He was sentenced on September 10, 2010. Neither the record before us nor the briefs of the parties make it crystal clear whether the version of KORA applied at Charles' sentencing was the 2009 version in effect at the time he committed his crime or an amended 2010 version that took effect on July 1, 2010. However, it is clear that Charles has not challenged his KORA registration requirement on an ex post facto basis; rather he attacks it only because judicial rather than jury factfinding supported its imposition. These circumstances persuade us that we should focus on the 2009 version of KORA in this case.

Charles' issue statement and argument in both his brief to the Court of Appeals and his petition for review to this court appears to further narrow his KORA challenge. The issue statement reads in pertinent part: "Because *the public disclosure requirements* of

KORA are punishment, the finding triggering such registration requirements should be made by a jury beyond a reasonable doubt." (Emphasis added.) The argument section of his brief does not focus on the public disclosure requirements mentioned in the issue statement; instead it mentions only the reporting fee requirement and the harshness of the Level 5 offense severity rating for violation of KORA.

Our *Doe v. Thompson* decision observes that the 2011 KORA provision for public dissemination of sex offender registrants' information contributes to the entire statutory scheme's punitive effect or nature. Slip op. at 33, 37-38, 44. The 2009 KORA public dissemination provision is nearly identical to that in the 2011 version, compare K.S.A. 22-4909(a) with K.S.A. 2011 Supp. 22-4909(a), although the 2011 KORA amendment did broaden the universe of registrants' information subject to public dissemination.

Likewise, the $20-per-report fee and the felony status of a KORA violation under the 2011 version contributed to the *Doe v. Thompson* holding that the statutory scheme was punitive in effect or nature as it relates to sex offenders. Slip op. at 34, 38-39, 44. Again, both the reporting fees and the felony status for violation are similar in the 2009 version of KORA. Compare K.S.A. 22-4907 with K.S.A. 2011 Supp. 22-4907.

In sum, although this case can be distinguished from *Doe v. Thompson* in certain ways, *Doe v. Thompson*'s overall conclusion that sex offender registration under the 2011 version of KORA is punitive should be extended to the 2009 version applied to a violent offender such as Charles as well, particularly when we focus on the three provisions upon which Charles concentrates: those on public dissemination, reporting fees, and felony penalty for violation. We therefore hold that the registration requirement qualifies as punishment under the Due Process Clause, and that its imposition on Charles required a jury finding of his use of a deadly weapon under *Apprendi*. Lacking such a finding here, we must vacate the registration requirement imposed at his sentencing.

26

All of this being said, we further acknowledge that today's decision by a new majority in *State v. Petersen-Beard*, 304 Kan. ___, ___ P.3d ___ (No. 108,061, this day decided), argued a year after *Doe v. Thompson*, may influence whether the KORA holding of this case is available to be relied upon by violent offenders whose appeals have yet to be decided. In *Petersen-Beard*, the majority arrives at a conclusion opposite from that arrived at in *Doe v. Thompson*, holding that application of KORA to sex offenders does not qualify as punishment. Slip op. at 26.

CONCLUSION

Based on our analysis of each of defendant's appellate challenges above, we affirm his convictions and vacate the sentencing requirement that he register as a violent offender under KORA.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

\* \* \*

JOHNSON, J., concurring:  I concur in the result reached by the majority. I take exception to the majority's holding that the prosecutor committed no error during closing argument, but I would find that the erroneous statements of personal opinion were harmless beyond a reasonable doubt.

---

[1]**REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 105,148 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.

27

First, I cannot be as charitable as the majority in characterizing all of the prosecutor's improper statements as merely "verbal tics." For instance, when discussing the critically important question of whether defendant's Nissan Pathfinder SUV could prove the deadly weapon element of aggravated battery, the prosecutor declared: "I'd say that that's a deadly weapon." No transition or time filler there. A juror would be hard-pressed to view that statement as anything other than the prosecutor's personal opinion as to what the evidence proved. The prosecutor's frequent use of "I think" and "I don't think" would do nothing to dissuade the jury that the prosecutor was proffering personal opinions.

But more importantly, I write separately to express my view that it is error, *i.e.*, outside the wide latitude given to prosecutors, to use words during closing argument that are commonly understood to state a personal opinion. If the prosecutor did not intend to state a personal opinion, then that inadvertence would indicate a lack of ill will under the second step of the analysis and could negate reversal. But a prosecutor should not be permitted to extend the bounds of proper argument through inadvertence or idiosyncratic speech patterns. Consequently, I would find that the prosecutor erred, albeit harmlessly.

LUCKERT, J., AND MICHAEL J. MALONE, Senior Judge, join in the foregoing concurring opinion.