NOT DESIGNATED FOR PUBLICATION

No. 126,166

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE WILLIAM JEREZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Submitted without oral argument. Opinion filed August 8, 2025. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Jamie L. Karasek*, assistant district attorney, *Thomas Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ATCHESON and ISHERWOOD, JJ.

PER CURIAM: Jose William Jerez was convicted of several offenses that stemmed from his involvement in an incident at a grocery store in Hutchinson. He now appeals, arguing that he should receive a new trial because the prosecutor improperly offered her personal opinion on various evidentiary matters during closing argument. After carefully reviewing the record and the parties' arguments, we agree that the prosecutor's statements veered outside the scope of permissible argument. But we also find that none of these statements affected the outcome of Jerez's trial. We thus affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2022, the assistant manager at a Dillons in Hutchinson was approached by several customers complaining that another customer, Jerez, was "cussing at them and being kind of rude about things." The assistant manager approached Jerez—who "smelled of alcohol," was acting "frantic," and was "talking to himself"—and asked him to leave. Jerez responded with "a couple belligerent things" but eventually allowed himself to be led out of the store.

Sometime later, Jerez reentered the store. He took a can of beer from a refrigerated shelf, opened it, poured it on nearby merchandise, and eventually discarded the half-empty can in another area of the store. When the store manager was informed that Jerez was "causing havoc," he promptly escorted Jerez off the property and called 911, advising police that Jerez had begun walking across the street towards a laundromat.

Officer Braden Stewart with the Hutchinson Police Department responded to the call. When Stewart arrived at the scene, he saw Jerez walking on the sidewalk. The two made eye contact, and Jerez then "kind of sat down on the sidewalk." Stewart got out of his vehicle to approach Jerez, but Jerez got up and started walking away—directly into the street with "moderate" oncoming traffic. Stewart identified himself as a police officer and yelled at Jerez to stop, but Jerez kept walking.

Stewart ran after Jerez, grabbed his right arm, and escorted him out of the street. When they reached the opposite sidewalk, Jerez began "pulling away" from Stewart, saying something like "you better watch out," and "start[ed] swinging his arms" at Stewart in a "punching motion." Stewart told Jerez to "knock it off" several times, but Jerez continued struggling. So Stewart took Jerez to the ground.

Jerez landed on his back with Stewart on top of him. Stewart tried to roll Jerez over on his stomach so he could put Jerez in handcuffs, but Jerez resisted—keeping his right arm extended away from his body. Stewart radioed dispatch and told them that he "was fighting" with the subject of the call. Stewart then reached for Jerez's right arm but saw that Jerez was holding a knife with the blade exposed. Based on the way Jerez was holding the knife, Stewart believed that Jerez was going to try to stab him. Stewart yelled, "he has a knife," grabbed Jerez's arm, and "slam[med] it on to the ground." Jerez dropped the knife, and Stewart pushed it 10-15 feet away.

As Stewart and Jerez continued struggling, two civilians jumped in to help. One grabbed Jerez's left arm while the other held his right. Jerez was "not necessarily still fighting[,] but he was still tensed up," not allowing Stewart to manipulate his arms or body. All the while, Jerez was calling Stewart and the two civilians "derogatory names."

A few minutes later, several other officers arrived, at which point the civilians stepped aside—although one of them continued to stand over the discarded knife. Stewart informed the other officers that Jerez had "almost stabbed [him]" and that Stewart had been "almost ready to draw down" (meaning, unholster his weapon and point it at Jerez to get him to comply with the officer). The three officers forced Jerez over onto his stomach, handcuffed him, and took him into custody. Stewart received first aid for a "small cut on [his] left hand" and "some scrapes" on his right knee.

The entire encounter between Stewart and Jerez was recorded on Stewart's body camera. Stewart later watched the recording, and he noticed that Jerez had been carrying the knife in his left hand while crossing the street—meaning that, unbeknownst to Stewart at the time, Jerez had the knife in his hand when he swung his arms at him.

Jerez was charged with several crimes: theft, criminal damage to property, interference with law enforcement, aggravated assault on a law enforcement officer,

battery on a law enforcement officer, and two alternative offenses of attempted aggravated battery on a law enforcement officer (by causing bodily harm with a deadly weapon or by causing physical contact in a manner whereby great bodily harm could be inflicted).

At trial, the State offered evidence through the testimony of the Dillons employees, the police officers, and the civilians who assisted in subduing Jerez. The jury also viewed the footage from Stewart's body camera.

Jerez testified in his defense. He explained that he was "tripping" that day and was already intoxicated when he entered the store. He acknowledged that he did not have permission to drink the beer or pour it on the merchandise, and he admitted that "[he] wasn't really in [a state] of mind to know what was going on." But Jerez maintained that when he saw Stewart's police car, he thought "[m]aybe [Stewart] was there for somebody else. I don't know"—"a high-speed chase or something."

As for his struggle with Stewart, Jerez explained that he had no intention of hurting anyone but himself that day. He did not remember much from when he was crossing the street, but he remembered picking up a knife off the ground and trying to cut his own wrist. And he claimed that he did not know that Stewart was following him across the street or that Stewart was a police officer when he grabbed Jerez's arm and spun him around. Finally, Jerez explained that he only said "better watch out" because he had a knife in his hand and was going to try to hurt himself.

During its deliberations, the jury submitted several written questions to the district court—largely dealing with the differences between the various charged crimes involving interference, battery, and attempted battery of law enforcement officers. The court responded to these inquiries after consulting with the parties.

The jury ultimately found Jerez guilty of theft, criminal damage to property, interference with law enforcement, and attempted aggravated battery against a law enforcement officer through physical contact. The district court sentenced Jerez to a controlling 39-month prison term and ordered him to pay $87 to Dillons in restitution.

## DISCUSSION

Jerez's arguments on appeal relate solely to several statements made by the prosecutor during her closing argument. He asserts that the prosecutor impermissibly invaded the province of the jury by offering her personal opinion about the evidence the jury would consider. Jerez asserts that these statements, individually and together, deprived him of a fair trial—especially considering the jury's apparent confusion about the various crimes charged involving law enforcement officers.

To evaluate claims of prosecutorial error, appellate courts use a two-step process:

- First, we determine whether an error occurred—whether the prosecutor's statements, viewed in context, fall outside "the wide latitude afforded prosecutors 'to conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial.'" *State v. Coleman*, 318 Kan. 296, 302, 543 P.3d 61 (2024).

- Second, we determine whether any error so infected the proceedings as to deprive the defendant of a fair trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). To avoid reversal when faced with a prosecutorial error, "the State must demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., [that] there is no reasonable possibility that the error contributed to the verdict.'" *Coleman*, 318 Kan. at 307.

5

During closing argument, a prosecutor may discuss the evidence and draw "'reasonable inferences from that evidence'" to argue that the evidence establishes the defendant's guilt. *State v. Blevins*, 313 Kan. 413, 428-29, 485 P.3d 1175 (2021); *State v. Mireles*, 297 Kan. 339, 368-69, 301 P.3d 677 (2013). But the prosecutor crosses the line when they offer their opinion on matters that are reserved solely for the jury; such conduct equates to "'unsworn, unchecked testimony.'" *State v. King*, 308 Kan. 16, 30-31, 417 P.3d 1073 (2018); *Mireles*, 297 Kan. at 368-69. What constitutes an impermissible opinion, however, is a fact-specific inquiry, meaning we evaluate the challenged statement in the context in which it was made rather than in isolation. *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018).

Almost a decade ago, the Kansas Supreme Court warned prosecutors that they were "on notice" that phrases like "I believe" and "I think" trod dangerously close to—or crossed—the line between permissible comments on the evidence and personal opinion. *State v. Charles*, 304 Kan. 158, 174-75, 372 P.3d 1109 (2016), *abrogated on other grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017). The court noted that these phrases should be replaced with less "subjectively loaded" phrases like "the evidence shows" or "I submit." 304 Kan. at 175. That way, the prosecutor merely discusses the evidence presented without tipping the scales with their personal beliefs or opinions. And the jury may independently assess the evidence rather than rely on the prosecutor's opinion of it.

But again, context matters. For example, the Kansas Supreme Court found no error when the prosecutor stated: "'*I believe* the evidence from the video shows that he was hit repeatedly with a gun.'" (Emphasis added.) *King*, 308 Kan. at 33. The court explained that "[t]he prosecutor was not advancing her personal opinion, but simply hedging her statement as she was describing the evidence." 308 Kan. at 33. In contrast, the court found that the prosecutor crossed the line by stating: "'*I think* there's sufficient

6

evidence for you to find beyond a reasonable doubt that these two defendants . . . committed the following crimes.'" 308 Kan. at 33-34 (declining to find error because prosecutor was not placed on notice that such comments were improper).

With these principles in mind, we turn to the prosecutor's statements that Jerez challenges here. Because Jerez challenges three statements, we reserve our consideration as to whether the prosecutor's actions affected the outcome of the trial until we have discussed each statement individually.

*The prosecutor's statement on Jerez's intent*

Jerez first asserts that the prosecutor impermissibly expressed her opinion when discussing the inference the jury should draw from Jerez's act of swinging his arm at Officer Stewart while holding a knife:

> "But what do you take from somebody holding a knife with the blade out, swinging it towards somebody else? What is the intent, or what are you attempting to do there? I think you can evaluate that evidence and decide for yourself what the intent was. If you swing a blade at somebody, what was the intent to do there? Well, what do you intend to do when you swing a blade at somebody? Are you attempting to make contact with that person, with that knife? Are you attempting to harm that person with that knife? *I would say, yes. That is the intent that you take from those actions*." (Emphasis added.)

We agree with Jerez that the prosecutor erred here. The prosecutor first led the jury to a compelling inference through a series of rhetorical questions—"If you swing a blade at somebody, what was the intent to do there?" That alone was not error. But the prosecutor crossed the line when she completed that inferential loop by answering her own rhetorical question—"I would say, yes. That is the intent that you take from those actions." In making this statement, the prosecutor crossed from permissible argument

7

concerning the evidence and reasonable inferences from that evidence to impermissibly offering her personal views on whether the State had proved its case.

*The prosecutor's "I maintain" statement*

Jerez next argues the prosecutor committed reversible error when she stated, "*I maintain* the State has shown that without a reasonable doubt [Jerez] committed the offenses of theft and criminal damage to property." (Emphasis added.) For the same reason we have previously discussed, we agree with Jerez that this statement crossed the line to impermissibly offer an opinion on whether the State had met its burden of proof— the ultimate question reserved for the jury. Indeed, the phrase "I maintain" is akin to other "subjectively loaded" phrases like "I believe" and thus an impermissible expression of opinion. See *King*, 308 Kan. at 30-33; *Charles*, 304 Kan. at 175.

*The prosecutor's "I believe" statement*

Finally, Jerez argues the prosecutor erred by stating:

"*I believe* when you apply the evidence as it's been presented, to the instructions as given, that you will find that there are no reasonable doubts as to the elements of these crimes that have been charged. I would ask you to find the defendant guilty on all charges." (Emphasis added.)

While this is a closer call, we ultimately agree with Jerez this language was also an impermissible comment on the evidence. The State points out that the prosecutor could have simply been using this phrase as inartful filler language. But we are not persuaded this was the case, especially considering the prosecutor's previous tendency to offer her personal beliefs in the argument. And prosecutors have been admonished to replace language like "I believe" with other phrases to ensure the prosecutor does not inject their personal opinion into the trial. Thus, we find the prosecutor erred here as well.

*Effect on the outcome of the trial*

Jerez argues that these statements by the prosecutor, taken individually or together, deprived him of a fair trial. He asserts that the jurors' questions to the court during deliberations indicated that they were having trouble distinguishing between the various crimes that had been charged involving Jerez's interactions with Stewart, the responding law enforcement officer. Jerez asserts that, given this apparent confusion, the State cannot show that the prosecutor's statements did not tip the outcome of the trial, particularly as to Jerez's motivations in swinging his hand (with the knife) at Stewart. After reviewing the jury's questions and the evidence presented, we disagree: The State has carried its burden to show the prosecutor's statements regarding her own opinions did not affect the jury's verdict.

Because Jerez's reversibility argument concerns the jury's questions regarding the various crimes charged, some further explanation is necessary. As we have indicated, the State charged Jerez with theft, criminal damage to property, and several crimes involving his interactions with Stewart:

- interference with a law enforcement officer,
- aggravated assault on a law enforcement officer,
- battery on a law enforcement officer;

as well as two alternative crimes of attempted aggravated battery on a law enforcement officer, committed

- by causing bodily harm with a deadly weapon, or
- by causing physical contact in a manner whereby great bodily harm could be inflicted.

At trial, Jerez did not challenge the allegations relating to the property crimes—he only contested the charges concerning his altercation with Stewart. After the case was submitted to the jury for deliberations, the jurors sent a series of questions to the court. These questions largely concerned the various law-enforcement-related offenses.

- The jury first submitted a question to the court asking whether the two alternative charges for attempted aggravated battery on a law enforcement officer were "the same." After consulting with the parties, the court correctly responded "no" and directed the jury to consider the elements of each charge.

- At the end of the first afternoon of deliberations, the jury submitted two additional questions. One question asked for a copy of Officer Stewart's testimony. The other asked whether there was "an option of a hung jury." After consulting with the parties the next morning, the court informed the jury that the court reporter would prepare the transcript of Stewart's testimony so she could read it back in open court. The court responded "yes" to the hung-jury question.

- A little while later, the jury submitted other questions to the court. The jury asked whether the court could "clarify the terms [of] aggravated assault"—whether "aggravated" meant that "a weapon was present," or whether "the weapon [had] to make contact with the victim." The jury also asked whether "a threat [had] to be made." And the jury asked whether the testimony of the laundromat owner could be read back. After consulting with the parties, the court referred the jury to the instructions they had been given and indicated that the court reporter would prepare the laundromat owner's testimony so it could be read again.

The jury assembled in the courtroom, and the court reporter read the testimony of Stewart and the laundromat owner. The jury continued its deliberations and later returned

with its verdict—finding Jerez had committed the crimes of theft, criminal damage to property, interference with a law enforcement officer, and attempted aggravated battery against a law enforcement officer through physical contact. The jury found Jerez not guilty of the remaining offenses.

On appeal, Jerez argues that these questions show the jury was having difficulty understanding the various charges against him. He asserts that, in this instance, the prosecutor's comments during closing argument were particularly harmful and could have caused the jury to lean in favor of a conviction "even if it had doubts." The State does not comment on the jury's series of questions but argues that the evidence against Jerez was overwhelming—based on the body camera footage and the testimony of multiple witnesses—and largely uncontested. The State also points out that the court instructed the jury that statements made by the attorneys are not evidence.

It is true, as the State points out, that we presume the jury follows the instructions that are provided. See *Coleman*, 318 Kan. at 311. The court here instructed the jury that "[s]tatements, arguments and remarks of counsel . . . are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." And then again—immediately before the prosecutor's closing argument—the court informed the jury: "You are reminded closing argument is not evidence. It's just a way the attorneys are suggesting you view the evidence."

While we presume the jury followed these instructions, the instructions do not provide the absolution the State seeks. The problem with the prosecutor's statements is not that those statements offered additional evidence, but that they invaded the province of the jury by commenting on the prosecutor's beliefs about what the evidence proved. The court's cautionary instruction to the jury does not directly address this concern.

Nevertheless, we agree with the State that the evidence against Jerez was overwhelming and supported by the testimony of several witnesses. Each of the prosecutor's erroneous statements concerned different charges. While the first comment involved attempted aggravated battery through physical contact, the second concerned theft and criminal damage to property (charges Jerez did not contest). And the third was a general statement that did not compound any prejudice.

All of the witnesses at trial who witnessed the altercation between Jerez and Stewart, with the exception of Jerez himself, testified that Jerez was swinging his arm at the officer in an effort to hit him, and the body camera footage showed that Jerez was doing so while holding a knife in his hand. The only contested matters, based on Jerez's testimony, were whether he knew Stewart was a law enforcement officer and whether Jerez was attempting to cut Stewart with his knife.

The jury's questions during deliberations did not concern Jerez's intent—instead, the questions concerned primarily the elements of the various law-enforcement offenses charged and the differences between those charges. We do not view these questions as demonstrating questions about the evidence, but a reflection of the jury's effort to carefully wade through and understand the various instructions concerning these charges. And the record shows the jury followed these instructions and weighed the evidence; it found that Jerez had committed two law-enforcement related offenses but at the same time found him not guilty of three other charges.

No trial is perfect. But a defendant is entitled to a fair trial, not a perfect one. *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013). After carefully reviewing the record and examining the errors in context and the nature and strength of the evidence presented, we conclude beyond a reasonable doubt that the prosecutor's errors during closing argument did not deprive Jerez of a fair trial.

12

Affirmed.