IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,075

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL L. PHILLIPS,
*Appellant.*

SYLLABUS BY THE COURT

1.

When ruling on a defendant's motion for justified-use-of-force immunity under K.S.A. 2019 Supp. 21-5231, the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and decide whether the State has carried its burden to show probable cause that defendant's use of force was not statutorily justified.

2.

To decide whether the State has met its burden to show probable cause under K.S.A. 2019 Supp. 21-5231, the district court must make fact-findings, which will usually require the court to resolve conflicts in evidence. The district court's legal conclusion on the probable cause determination must be supported by these fact-findings.

3.

The State meets its burden to show probable cause under K.S.A. 2019 Supp. 21-5231 if the facts as found by the district court are sufficient for a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of defendant's guilt despite the claim of justified use-of-force immunity.

1

4.

The State may defeat a defendant's motion under K.S.A. 2019 Supp. 21-5231 by showing probable cause that defendant's use of force was not justified under K.S.A. 2019 Supp. 21-5222 because: (1) the defendant did not honestly believe the use of force was necessary under the circumstances, and/or (2) a reasonable person would not believe the use of force was necessary under the circumstances.

5.

The State may defeat a defendant's motion under K.S.A. 2019 Supp. 21-5231 by showing probable cause that the defendant initially provoked the use of force under the circumstances enumerated in K.S.A. 2019 Supp. 21-5226(b) and (c).

6.

When ruling on a defendant's motion for immunity under K.S.A. 2019 Supp. 21-5231, the district court need not make any particularized findings, but it must be apparent from the record that the district court not only recognized but also applied the appropriate legal standard in reaching its probable cause determination. In other words, the record should reflect that the district court considered the totality of the circumstances, weighed the evidence without deference to the State, and resolved conflicting evidence, in arriving at its legal conclusion regarding the probable cause determination.

7.

Generally, it is not legally appropriate to instruct the jury on a lesser included offense when the elements are broader than the charged crime; but under the facts of this case, the proposed lesser included offense instruction on level 7 aggravated battery under K.S.A. 2019 Supp. 21-5413(b)(1)(C) did not impermissibly broaden the actus reus element of level 4 aggravated battery under K.S.A. 2019 Supp. 21-5413(b)(1)(A).

2

8.

A district court's failure to instruct on a lesser included offense will only result in error if the instruction would have been factually appropriate.

9.

A defendant's absence at a continuance hearing is a violation of the right to be present unless the defendant knowingly and voluntarily waived that right.

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed January 15, 2021. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.: In 2017, Michael L. Phillips shot and killed his brother, James Rotramel, outside the home they shared. Phillips also shot and seriously injured Kristofer Hooper during the same encounter. Phillips claimed he shot Rotramel and Hooper in self-defense and moved for immunity from prosecution under K.S.A. 2019 Supp. 21-5231. After conducting a full evidentiary hearing, the district court denied the motion. Nevertheless, Phillips presented his self-defense theory at trial. The jury convicted him of first-degree murder and aggravated battery. The district court subsequently denied Phillips' motion for new trial alleging ineffective assistance of counsel.

On direct appeal, Phillips claims the district court erred in ruling on his immunity motion and his motion for new trial. He also argues the district court erred in denying his request for a jury instruction on a lesser included offense to the aggravated battery charge. For the reasons outlined in this opinion, we affirm Phillips' convictions.

FACTS AND PROCEDURAL BACKGROUND

*Events Leading Up to the Shooting*

On a February night in 2017, James Rotramel wanted to attend a birthday party at a friend's house. Because Rotramel was under court-ordered supervision at the time, he needed a chaperone to go with him. He asked his brother, Michael Phillips, and Phillips agreed to go with Rotramel. At some point during the party, Phillips was overheard saying, "if you don't do dope and sell dope, you're not a man." As a result, the homeowners asked Phillips to leave, but Rotramel stayed.

Phillips returned to the home he shared with Rotramel and their mother. He was angry at Rotramel because he felt Rotramel did not stand up for him at the party. Between 2:00 a.m. and 3:08 a.m., Phillips exchanged a series of instant messages with Rotramel on Facebook Messenger. In the messages, Phillips expressed his anger at Rotramel and threatened to harm him when he came home.

In addition to the messages sent to Rotramel, Phillips posted on Facebook that he "love[d] to find how blood is weaker than shit" and implicitly called Rotramel out for a fight. Phillips messaged a friend, telling her Rotramel "will be lucky if i dont break his leg," and "if [the people at the party] dont beat his ass i will in the next few days." Phillips also messaged another one of his brothers, telling him "as of tonight you are the only thing I will ever call a brother." Phillips explained that "[Rotramel] left me high and dry to being called a tweaker. standing right there he lashed at me as the bad guy . . . im

4

breaking his leg when he comes home." He added, "after what he said to me on facebook, he will be lucky to breath at all," and "i wont mind 3 hots and a cot. on everyone elses dime."

Hooper gave Rotramel a ride home from the party. Two other partygoers rode in the back seat of Hooper's car. As Hooper pulled up to Rotramel's home, he heard a gunshot. Hooper turned the car around and parked on the street. He and Rotramel got out of the car.

Phillips and Rotramel lived on a 5-acre property located in a rural area outside Valley Center. The property included a house, set back about 145 feet to the west of the road, and a detached garage located just north of the house. The perimeter of the property was enclosed by a fence with a metal access gate located near the intersection of the road and the private driveway. The private driveway traversed generally east to west from the road to the garage. The metal access gate could be closed and locked to inhibit vehicles from accessing the property. On the north side of the house, facing the garage, there was a small, raised wooden deck or porch attached to the home. The porch stairs led to a paver stone patio area between the house and the garage. On the east side of the patio there was a wooden privacy fence facing the road that extended from the north side of the house to the south side of the garage with a gate located roughly in the middle. On the west side of the patio, there was a white picket fence facing the backyard that generally ran parallel to the wooden privacy fence.

After getting out of the car, Rotramel and Hooper jumped the outer perimeter fence surrounding the property, ran toward the house, and entered the open gate of the privacy fence leading to the patio. Phillips shot Rotramel and then Hooper on the patio. A 911 call reporting the shooting came in around 3:17 a.m. Rotramel died from a single gunshot wound that transected his right femoral artery. Hooper survived a gunshot wound to his left hip.

5

*Immunity Hearing*

The State charged Phillips with first-degree premeditated murder and aggravated battery. Phillips filed a motion to dismiss, claiming he acted in self-defense and was immune from prosecution under K.S.A. 2019 Supp. 21-5231. The district court held an evidentiary hearing on the motion.

Phillips testified at the immunity hearing. He denied talking about "dope" at the party, which he understood to mean methamphetamine. According to Phillips' testimony, Rotramel was present when Phillips was asked to leave the party, and Phillips and Rotramel had heated words. Phillips testified a "big guy" then grabbed his arm and led him toward the road. That guy told Phillips, "[Y]ou need to leave. These guys are about to jump you, and if you come back, you're going to get really fucked up." Phillips testified this guy then lifted his shirt and showed the handle of a pistol.

After Phillips drove home, he locked the gate across the driveway. That gate was not normally locked, but Phillips claimed he locked it that night because he was scared. He went inside and tried to talk to Rotramel on Facebook but claimed Rotramel was being disrespectful. Phillips also admitted that the tone of his communications with Rotramel leading up to the shooting was "a little aggressive." When Rotramel sent a message to Phillips claiming he was coming home and bringing the "big fucking ginger," Phillips said he thought Rotramel was referring to the guy at the party who had the pistol.

Eventually, Phillips decided Rotramel was just blowing off steam in their communications and did not intend to take any action, so Phillips went outside to have a cigarette. While outside, Phillips claimed he saw a car driving past the house with its headlights off when someone inside the car waved something that looked like a pistol. Phillips explained that when the same car drove past the house a second time, he went

6

into the garage to get a 50-caliber black powder rifle. He came back outside and fired the rifle into the air as the car drove by a third time. Phillips explained that he fired the gun to make sure he would be the target of any possible drive-by shooting, rather than his mother, Teresa, who was inside the house.

After Phillips fired the rifle, he testified Teresa came outside and asked what he was doing. Phillips told her he was trying to chase away Rotramel's friends and she should go back in the house. Phillips then went back in the garage, grabbed a 12-gauge shotgun, and loaded it with several shells.

Phillips exited the garage onto the patio. He said he saw two people about 10 to 15 feet away running toward him but could not see who they were and could not remember if they were carrying anything. Phillips testified that he fired, fearing he might not otherwise live, but intentionally aimed low because he "wasn't trying to kill nobody." He claimed he did not know he was shooting his brother at that time. After the first shot, Phillips said one of the two people ran into him, and they staggered together all the way back to the white picket fence. Phillips then fired a second time.

After firing the second shot, Phillips said he took a few steps toward the privacy fence gate but dropped the gun and ran when he saw more people getting out of the car. Phillips said someone followed him, so he turned around, put his hands up, and said, "[S]hoot me if you're gonna," because he was scared. The person said, "I'm on your side," but Phillips responded, "[N]o, no. I just shot your friends." Phillips said he then took off running to a neighbor's house to call 911. He told his neighbor that he had shot two people, and he was afraid one of them was Rotramel. At the hearing, Phillips explained that he was afraid he may have shot Rotramel because he assumed Rotramel had been one of the people in the car, and he could tell the other two people who got out of the car after the shooting were not Rotramel.

7

Phillips' account of events varied in several material respects from the evidence offered by the State at the immunity hearing. Detective Brian Hollyfield testified he interviewed Phillips shortly after the shooting. Phillips recounted the night's events for Hollyfield but did not say anything about seeing a gun at the party. Hollyfield also interviewed Phillips' neighbor. She said Phillips told her he had shot two people and one of them was his brother.

Hooper also testified at the immunity hearing. He did not recall seeing any weapons at the party or any person displaying a weapon. After Phillips left the party, Hooper agreed to give Rotramel a ride home later that night. Hooper left the party with Rotramel and two other people, and he planned to drop off Rotramel first. Hooper testified that Rotramel did not appear agitated or angry on the drive home, and nobody discussed any plan to confront Phillips. As far as Hooper knew, nobody in the car had any weapons. Earlier in the hearing, forensic investigator Tiffany Morland testified that no weapons were found in Hooper's vehicle when police searched it.

As Hooper approached Rotramel's house in the vehicle, he said everyone in the vehicle heard a gunshot. After he parked the car, Hooper and Rotramel got out and moved quickly toward the house to check on everyone's safety. Both Rotramel and Hooper identified themselves by name and yelled, "Don't shoot," as they ran toward the house.

When Hooper was about 10 feet away from the open gate of the privacy fence leading to the patio, he saw Phillips holding a 12-gauge shotgun. Hooper testified that Phillips shot Rotramel, and Rotramel fell to the ground screaming. Phillips then approached Hooper. As Hooper tried to push the gun to the side, Phillips fired, hitting Hooper's hip. Phillips then ran off. Hooper told Rotramel an ambulance was coming, but he "had to get out of there or else [he] wasn't going to make it either." Hooper went back

8

to his car, and one of the other passengers drove him to the hospital. Hooper testified that neither he nor Rotramel fought with Phillips before Phillips shot them.

Teresa testified she went to bed around 10:00 p.m. and later woke up to the sound of a gunshot. She heard some yelling that sounded like it was coming from between the house and the road, but she could not tell who was yelling or what was being said. She ran outside to see what was going on. She did not see or hear Phillips while she was out on the patio. But she did see a car parked out in the road and a person walking up the driveway. She could see the person was tall with broad shoulders, but she did not know who it was.

Teresa ran back inside to put on some warmer clothes. While inside, she heard two more gunshots in quick succession. When she went back outside, Rotramel was lying on the ground and Hooper was sitting beside him. She remembered Hooper saying something about being shot. She then ran back inside to find her phone.

The amount of lighting on the property at the time of the shooting was heavily contested at the hearing. Phillips said the porch light was not on, so when he came out of the garage, he was coming from a well-lit area to a dark area. Teresa said she did not remember if the porch light was on that night, but a large overhead light on the front of the garage illuminated the entire driveway. Teresa noted this light was equipped with a sensor that automatically turned on the light at night. Hooper testified that a light was on when he got to the house, and the lighting in the area was sufficient for him to see Phillips and the porch area clearly from more than 10 feet away.

Forensic investigator Morland testified she arrived at the scene around 5:00 a.m., about two hours after the shooting. She said the overhead light on the garage was on, along with four solar lights on the fenceposts near the gate across the private driveway. She believed the porch light was on as well.

9

Morland also visited the house at night to check the lighting conditions. She testified that in addition to the overhead light on the garage, a total of six solar lights lined the driveway and several small solar lights were in the patio area. She testified that standing in the driveway she would have been able to see an individual clearly from 20 feet away in those lighting conditions. She also said there was adequate lighting on the patio, though some areas were heavily shadowed. On cross-examination, Morland did not know whether the solar lights would have been as bright at the time of the shooting as they were when she visited the house shortly after sunset.

At the hearing, the State also admitted the instant messages Phillips exchanged with Rotramel from 2:00 a.m. to 3:08 a.m.—roughly nine minutes before the call to 911. Contrary to Phillips' characterization, the messages reflect that Phillips' anger and animosity toward Rotramel never subsided in the time leading up to the shooting, and during this time, Phillips repeatedly made direct threats of violence against Rotramel:

| Sender | Message Content | Time |
|---|---|---|
| Phillips | "i hope you have better plans cuz ill break your legs when i see you. fuck off you coward faggot" | 2:00:12 a.m. |
| Phillips | "hope that was good for you cuz" | 2:20:41 a.m. |
| Phillips | "i know your online and you know im mad as fuck" | 2:20:54 a.m. |
| Phillips | "tell that ittle bitch to come take your ass whoppin" | 2:21:19 a.m. |
| Phillips | "after this your are enemy to me" | 2:21:33 a.m. |
| Phillips | "dont sleep" | 2:21:37 a.m. |
| Rotramel | "I dont give a fuck dude. Fuck you. I tried letting you be frinds with my friends but you made me look like shit so i dont care what you do. You aint shit to me anymore 'cuz' or 'brother' you dead to me. Why do you think i blocked you in the first place?? Haha i think your just as psycho as lyndesy" | 2:24:10 a.m. |
| Phillips | "bring all 4 of the people wantint to start shit. how dare you sit there and listen to that let alone back it" | 2:24:45 a.m. |

10

| Sender | Message Content | Time |
|---|---|---|
| Phillips | "dont come home" | 2:25:08 a.m. |
| Phillips | "i got you cuz" | 2:25:17 a.m. |
| Phillips | "your lifew is fuucked now" | 2:25:23 a.m. |
| Rotramel | "Try me bitch" | 2:25:53 a.m. |
| Phillips | "come home" | 2:27:30 a.m. |
| Phillips | "its on" | 2:27:33 a.m. |
| Phillips | "your fucking dea" | 2:27:38 a.m. |
| Phillips | "just like you r daddy" | 2:27:45 a.m. |
| Phillips | "bitch " | 2:27:47 a.m. |
| Phillips | "common" | 2:28:00 a.m. |
| Phillips | "be a man bitch" | 2:28:08 a.m. |
| Phillips | "i swear to god your fuckin dead" | 2:28:19 a.m. |
| Phillips | "dead to me and everything in your life" | 2:28:33 a.m. |
| Phillips | "ill folowe you just to make your life hell now" | 2:28:43 a.m. |
| Phillips | "forever" | 2:28:46 a.m. |
| Phillips | "you wont have a job aftre tuesday if your ever free then" | 2:29:18 a.m. |
| Phillips | "come home i dare yopu" | 2:29:33 a.m. |
| Phillips | "ill be waiting you little coward bitch" | 2:32:02 a.m. |
| Phillips | "your gonna wish you were in prison" | 2:37:59 a.m. |
| Phillips | "black truck wont ever run i promise that one. ask me why? your not a mechanic and thats what it will take now for it to ever fire. electric is a bitch huh, figure that one out" | 2:46:44 a.m. |
| Phillips | "yeah you just opened a can of omg im going to jail" | 2:51:15 a.m. |
| Phillips | "alone with a minor. yup" | 2:51:34 a.m. |
| Phillips | "come home little coward" | 2:51:47 a.m. |
| Rotramel | "Keep threatening me like a bitch. Your all talk and no bark" | 2:52:05 a.m. |
| Phillips | "come home and see" | 2:52:15 a.m. |
| Phillips | "mouth" | 2:52:18 a.m. |
| Phillips | "your the coward" | 2:52:21 a.m. |
| Phillips | "wont ever talk shit to my face]\\" | 2:52:32 a.m. |
| Phillips | "little bitch wanna titty from moomy" | 2:52:45 a.m. |
| Phillips | "your drunck ass wont get out this" | 2:53:07 a.m. |

| Sender | Message Content | Time |
| --- | --- | --- |
| Phillips | "this is real life" | 2:53:10 a.m. |
| Phillips | "no staff to help you now" | 2:53:16 a.m. |
| Phillips | "im begging you to come home" | 2:53:34 a.m. |
| Phillips | "be a real man" | 2:53:41 a.m. |
| Phillips | "back what you say" | 2:53:45 a.m. |
| Phillips | "your gonna ruin the day you ever met me" | 2:53:57 a.m. |
| Rotramel | "We on our way bitch me and that big fucking ginger" | 2:54:53 a.m. |
| Phillips | "loaded ready to go cuz" | 2:55:09 a.m. |
| Rotramel | "And the little dude with the big ears" | 2:55:12 a.m. |
| Rotramel | "[Phillips] missed a call from you" | 2:55:57 a.m. |
| Rotramel | "Only a bitch has to use a gun" | 2:56:19 a.m. |
| Rotramel | "Bare hands bitch lets go" | 2:56:36 a.m. |
| Rotramel | "You fucked with the wrong crowd" | 2:56:48 a.m. |
| Phillips | "lol your funny" | 3:07:54 a.m. |
| Phillips | "common bitch" | 3:08:09 a.m. |
| Phillips | "come home" | 3:08:12 a.m. |

At the end of the hearing, the district court found the following facts were in dispute: whether Phillips had threatened Rotramel over Facebook; whether there had been a gun at the party or in Hooper's car; whether Rotramel had identified himself as he approached the house; whether there was enough light that Phillips could have recognized Rotramel; whether Phillips should have known that Rotramel was the person walking up the driveway; whether Phillips was justified in believing he had to shoot Rotramel and Hooper in self-defense; and whether Phillips was an aggressor and thus unable to assert a self-defense claim.

After identifying these factual disputes, the district court concluded:

"As I've stated, significant material disputes exist. I find no immunity is applicable in this case. I'll deny the motion on that basis. However, I do want to make sure that the self-defense argument and the aggressor argument remain as disputed facts or, depending on the presentation of evidence, submission to the jury for the jury's determination as ultimate trier of the fact."

*Trial and Verdict*

The case proceeded to trial where the other two passengers in Hooper's car, Taylor Hanes and Tyler Vrtiska, both testified. Hanes said neither he, Hooper, nor Vrtiska had a weapon, and no one waved anything out of the car window. He also never heard Rotramel say anything about a fight with Phillips. After Hooper parked the car, Rotramel and Hooper went up to the house, with Rotramel leading the way. When Hanes heard gunshots, he thought he would be safer if he got out of the car, so he lay down in a ditch by the side of the road until Hooper got back. After Hooper and Hanes got back in the car, Vrtiska drove them to the hospital.

Vrtiska remembered Rotramel saying he would probably have to fight Phillips when he got home, but Rotramel "acted like it was just a brotherly thing." As they pulled up to the house, Vrtiska heard a gunshot. He also heard Rotramel and Hooper yelling their names and saying to stop shooting as they approached the house. After two more shots rang out, Vrtiska saw someone, who he assumed was Phillips, jump the fence and run away. Vrtiska got out of the car and yelled Hooper's name. Hooper then limped back to the car and Vrtiska helped him in.

The homeowner who asked Phillips to leave the party also testified. He admitted that he threatened to "beat [Phillips'] ass" if Phillips did not leave the party, but he denied having a handgun. Several partygoers also testified that to the best of their knowledge, no one at the party had a weapon.

Phillips testified in his own defense at trial. Much of his trial testimony was generally consistent with his testimony at the immunity hearing, but there were several notable differences. At the immunity hearing, Phillips testified he shot the first person and then the second person physically attacked him. However, at trial, Phillips testified the incident began when one of the two victims physically ran into him and the gun went off, striking the other victim. Then, Phillips claimed he struggled with the person who had physically run into him, eventually shooting that person.

The district court instructed the jury on Phillips' theory of self-defense. The jury convicted him of first-degree murder and aggravated battery. Before sentencing, Phillips filed a motion for new trial alleging ineffective assistance of counsel. After a full evidentiary hearing, the district court denied the motion. The district court sentenced Phillips to life in prison without the possibility of parole for 50 years. Phillips appeals.

ANALYSIS

*The District Court Erred in Ruling on Phillips' Immunity Motion.*

Phillips argues the district court erred in denying his motion for immunity under K.S.A. 2019 Supp. 21-5231. Specifically, Phillips contends that by identifying material facts in dispute, but failing to resolve these fact disputes in favor of one party or the other, the district court improperly weighed the evidence in the light most favorable to the State, contrary to the controlling legal standard set forth in *State v. Hardy*, 305 Kan. 1001, 1011, 390 P.3d 30 (2017).

14

In response, the State argues the district court did not err because K.S.A. 2019 Supp. 21-5231 does not require the court to make particularized findings on the record. According to the State, the district court implicitly construed the disputed evidence against Phillips. The State adds that the district court's repeated reference to *Hardy* allays any concerns that it improperly weighed the evidence in a light most favorable to the State.

*Legal Framework and Standard of Review*

The self-defense immunity statute provides:

"(a) A person who uses force which, subject to the provisions of K.S.A. 2019 Supp. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 2019 Supp. 21-5222, 21-5223 or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force . . . . As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

. . . .

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause." K.S.A. 2019 Supp. 21-5231.

The plain language of K.S.A. 2019 Supp. 21-5231 evidences the Legislature's intent to create a "true immunity" that prevents the State from criminally prosecuting individuals who are statutorily justified in their use of force. *State v. Collins*, 311 Kan. 418, 424, 461 P.3d 828 (2020). To give effect to this immunity, district courts must perform a gatekeeping function and insulate these qualifying cases from continued prosecution and trial. 311 Kan. at 424. A defendant invokes the district court's

15

gatekeeping function by filing a motion under K.S.A. 2019 Supp. 21-5231, which then imposes a burden on the State to come forward with evidence establishing probable cause that the defendant's use of force was not statutorily justified. *State v. Thomas*, 311 Kan. 403, 412, 462 P.3d 149 (2020).

In *Hardy*, we established the legal standard governing a district court's analysis of a motion for immunity under K.S.A. 2019 Supp. 21-5231: "[T]he district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." 305 Kan. at 1011. In *Thomas* and *Collins*, we further clarified that district courts should follow a two-step process when making their probable cause determinations on pretrial immunity motions. First, the district court must make findings of fact based on the stipulations of the parties and evidence presented at the hearing, along with any reasonable inferences therefrom. In this first step, "the district court usually is squarely tasked with resolving conflicts in the evidence" in favor of one party or the other. *Thomas*, 311 Kan. at 413; see *Collins*, 311 Kan. at 425. Second, the district court must then reach a legal conclusion as to whether the State has met its probable cause burden based on its factual findings. *Thomas*, 311 Kan. at 413-14; *Collins*, 311 Kan. at 425.

On appeal, we review the district court's fact-findings arising from disputed evidence for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. *Thomas*, 311 Kan. at 409.

16

*The Record Fails to Establish that the District Court Applied the Appropriate Legal Standard.*

At the outset of the immunity hearing, the district court identified the correct legal standard from *Hardy*, stating it "must consider the totality of the circumstances in weighing the evidence before it without deference to the [S]tate. The court must determine if the [S]tate has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." At the close of evidence, the district court reiterated this same standard. Yet, in its ruling, the district court merely found that several material questions of fact were in dispute and concluded that this factual dispute precluded immunity. The district court succinctly pronounced, "As I've stated, significant material disputes exist. I find no immunity is applicable in this case. I'll deny the motion on that basis."

Based on the record before us, we cannot conclude the district court fulfilled its gatekeeping function in a manner consistent with the controlling legal standard announced in *Hardy*, *Thomas*, and *Collins*. In denying the motion, the district court did not resolve the disputed issues of fact relevant to the probable cause determination. Nor did it conclude that the State had shown probable cause that Phillips' use of force was not statutorily justified under the totality of the circumstances.

We are unwilling to accept the State's invitation to infer such appropriate findings and conclusions from the ruling simply because the district court identified the correct legal standard. Such an inference is undermined by the district court's extensive reference to several material fact disputes, without resolving these disputes, along with its apparent conclusion that the existence of these material fact disputes provided a legitimate basis to deny immunity. Quite simply, the district court's analysis suggests it identified, but failed to apply, the proper legal standard.

17

We recently addressed a similar issue in *Thomas*. There, the district court granted Thomas' self-defense immunity motion after an evidentiary hearing. In ruling on the motion, the district court concluded that the State had failed to show probable cause that self-defense immunity did not apply without first resolving several factual disputes relevant to the probable cause determination. On review, we held the district court erred, explaining that *Hardy* required the district court to resolve the numerous factual disputes *before* deciding whether the defendant had justifiably used force in self-defense under K.S.A. 2019 Supp. 21-5222(b). Likewise, we found resolution of these factual disputes was necessary to determine whether Thomas was an aggressor under K.S.A. 2019 Supp. 21-5226 and thereby excluded from the protections afforded to qualified individuals under the self-defense statutes. *Thomas*, 311 Kan. at 413-14.

Here, even though the district court denied immunity, the nature of the error is the same as in *Thomas*—the district judge ruled on the motion without resolving any of the evidentiary conflicts relevant to the probable cause determination. Moreover, here, the district court denied immunity without concluding that the State had established probable cause that the defendant's use of force was not statutorily justified under the totality of the circumstances. These omissions constitute error under *Hardy*, *Thomas*, and *Collins*.

In reaching this conclusion, we do not suggest that a district court is required to make any particularized findings when ruling on an immunity motion. Indeed, the various statutes governing self-defense and the fact-intensive nature of proceedings under K.S.A. 2019 Supp. 21-5231 prevent us from establishing any such rule. However, it must be apparent from the record that the district court not only *recognized*, but also *applied,* the appropriate legal standard in reaching its probable cause determination. In short, the record should reflect that the district court considered the totality of the circumstances, weighed the evidence without deference to the State, and resolved conflicting evidence, in arriving at its legal conclusion regarding the probable cause determination.

*This Error is Not Subject to Harmless Error Analysis.*

We have previously found a district court's error in ruling on a self-defense immunity motion to be subject to statutory harmless error analysis—that is, an appellate court must be persuaded there is no reasonable probability the error affected the outcome of the trial in order to deem error harmless. *State v. Ultreras*, 296 Kan. 828, 845, 295 P.3d 1020 (2013) (citing *State v. Ward*, 292 Kan. 541, 564-65, 256 P.3d 801 [2011]). However, the circumstances here distinguish this matter from *Ultreras*.

*Ultreras* was one of our earliest cases interpreting Kansas' self-defense immunity statute. See *Ultreras*, 296 Kan. at 836 (noting only one prior opinion addressing Kansas self-defense immunity statute). Not surprisingly, *Ultreras* relied on persuasive authority from other jurisdictions to support its interpretation and analysis of Kansas' self-defense immunity statute.

But our self-defense immunity caselaw has developed significantly since *Ultreras*. In subsequent cases, we have clarified that K.S.A. 2019 Supp. 21-5231 provides not only a defense to criminal liability, but also complete immunity from criminal prosecution. See *Hardy*, 305 Kan. at 1010-11. To safeguard this immunity, we have imposed a gatekeeping obligation on district courts, requiring them to foreclose continued prosecution where the State cannot establish probable cause that the defendant did not act in self-defense. 305 Kan. at 1010-11. And we have identified a two-step process for district courts to follow in discharging their gatekeeping function, a process that requires them to resolve evidentiary conflicts in ruling on the immunity question. See *Thomas*, 311 Kan. at 413-14; see also *Hardy*, 305 Kan. at 1013 ("[D]istrict courts must 'construe disputed evidence' against one party or the other in order to fulfill its gatekeeping role and give effect to the full scope of the plain meaning of the term 'immune.'").

These decisions demonstrate that a defendant's right to statutory immunity should be adjudicated at the early stages of the proceeding based on the evidentiary record submitted at the motion hearing. Otherwise, the immunity protections afforded by our Legislature would be rendered meaningless if the resolution of the immunity question, including disputed facts relevant to it, were delayed until trial. Moreover, these decisions illustrate an important difference in the injury a defendant potentially suffers as a result of immunity-related errors, compared to other trial errors. With other trial errors, the defendant's potential harm or injury relates to the fairness or legitimacy of the jury's verdict. However, in the case of immunity-related error, the potential harm or injury is the continued prosecution of the case in violation of defendant's statutory right to immunity. Quite simply, immunity error does not implicate the verdict.

This is particularly true where, as here, the quality or scope of the self-defense evidence at the pretrial evidentiary hearing differs from the trial evidence. In *Ultreras*, the self-defense evidence offered at the immunity motion was substantially similar to the evidence presented at trial, and therefore, we found the jury's verdict demonstrated that any error in ruling on the immunity motion was harmless. 296 Kan. at 846-47. In applying this harmless error analysis, *Ultreras* relied on *Dennis v. State*, 51 So. 3d 456, 464 (Fla. 2010). *Ultreras*, 296 Kan. at 837-42, 845. In *Dennis*, the district court erred by summarily denying defendant's immunity motion, rather than conducting a pretrial evidentiary hearing and resolving any issues of fact. 51 So. 3d at 463. However, the Florida Supreme Court concluded the error was harmless because the jury rejected Dennis' self-defense evidence in returning a guilty verdict. 51 So. 3d at 464. Importantly, Dennis did not "assert that at a pretrial evidentiary hearing he would have presented evidence different from or additional to the evidence he presented at trial." 51 So. 3d at 464.

Here, the self-defense evidence presented at Phillips' immunity hearing differed in substance and scope from the evidence presented at trial. For example, at the hearing, Hooper was the only State's witness to testify about the party and the shooting. But at trial, the State presented testimony from Hooper, Hanes, and Vrtiska, as well as two other partygoers. The testimony of these other witnesses corroborated Hooper's testimony and provided new details that conflicted with Phillips' version of events. Also, during the immunity hearing, Phillips' testimony about the circumstances surrounding the shooting differed from his account of the events offered at trial.

In these circumstances, where the evidence presented at the immunity hearing does not align with the trial evidence, a statutory harmless error analysis is not appropriate. Such an analysis tests only the soundness of the verdict, when the verdict itself is not in question. Instead, the alleged injury at issue relates solely to Phillips' statutory right to immunity and freedom from continued prosecution, based on the showing presented at the evidentiary hearing.

### *The Appropriate Remedy*

We are thus left to determine the appropriate remedy under a most unique set of circumstances. Ordinarily, when a district court fails to apply the appropriate legal standard and/or fails to make adequate findings on the record, precluding meaningful appellate review, the appropriate remedy is to remand the cause to the same district judge who conducted the hearing to make adequate findings and conclusions under the correct legal framework. See, e.g., *State v. Daino*, 312 Kan. 390, 406-07, 475 P.3d 354 (2020) (reversing ruling on motion to suppress because district court applied wrong legal framework and remanding for additional proceedings and fact-findings); *State v. Garcia*, 295 Kan. 53, 64, 283 P.3d 165 (2012) (reversing ruling on motion to withdraw plea based on erroneous understanding of law and remanding for another hearing applying appropriate legal standard). Unfortunately, that remedy is unavailable here because the

21

district judge who presided over the immunity hearing has since passed away. See K.S.A. 60-409(a) (stating facts that may be judicially noticed).

Adding to the complication, Phillips specifically requested remand for reconsideration on the existing record, rather than a new evidentiary hearing. And this request is reasonable given that the district court conducted a full evidentiary hearing on the immunity motion, and thereafter, the matter proceeded to trial, the jury returned a verdict, and the district judge sentenced Phillips.

Were we to remand the matter to the district court for reconsideration on the existing record, any newly assigned district judge would necessarily be in the same position as our court in reviewing the hearing transcript and admitted exhibits. Working from the existing record, the district judge would be in no better position than our court to assess credibility or resolve conflicting evidence. Given this extremely unique set of circumstances, and in the interests of judicial economy and speedy resolution, we will thus conduct a probable cause assessment based on the current record.

We note that in *Thomas* we faced a somewhat similar predicament. There, the Court of Appeals took judicial notice that the district judge who presided over the hearing on Thomas' immunity motion had retired while the case was on appeal. After finding the district judge had erred in granting the motion, the panel remanded for a new evidentiary hearing before a new district judge. *State v. Thomas*, No. 116,111, 2017 WL 6064660, at *13 (Kan. App. 2017) (unpublished opinion), *aff'd* 311 Kan. 403, 462 P.3d 149 (2020).

However, the procedural posture of this case distinguishes it from the remedy ordered in *Thomas* for at least two reasons. First, Phillips has specifically requested remand for reconsideration on the existing record, not a new evidentiary hearing. In contrast, Thomas did not challenge the Court of Appeals' direction for a new evidentiary

22

hearing, and we observed that the panel's decision was appropriate given the circumstances. *Thomas*, 311 Kan. at 416.

Second, the subsequent litigation of this matter to finality distinguishes it from *Thomas*. In *Thomas*, the district court granted defendant's immunity motion during the early phases of the criminal proceedings. Here, Phillips' case proceeded to trial, the jury convicted Phillips, and the district court sentenced him. The question we are left to decide is not whether the State can come forward with evidence showing probable cause that Phillips was not statutorily justified in his use of force. Indeed, the jury verdict answers that question for us in the affirmative. See *Thomas*, 311 Kan. at 412 (probable cause burden under K.S.A. 2019 Supp. 21-5231 is substantially less than proof beyond a reasonable doubt required to obtain a guilty verdict). Rather, the question here is whether the State presented evidence at the original immunity hearing sufficient to establish probable cause under the totality of the circumstances. This question is best answered by reviewing the record of the original hearing rather than ordering a new one.

Therefore, in these unique circumstances, our review of the existing record is appropriate because we are in as good a position as the district court to determine whether the State satisfied its burden at the evidentiary hearing to show probable cause that Phillips' use of deadly force was not statutorily justified. While such a resolution may be somewhat unique, we note it is not unlike our review of search warrant probable cause determinations, in which we evaluate the evidence in the record to determine whether the totality of the circumstances supported the district court's probable cause finding. See, e.g., *State v. Fisher*, 283 Kan. 272, 300-01, 154 P.3d 455 (2007) (appellate court independently reviews content of affidavit to determine if substantial basis for magistrate judge's probable cause finding).

23

*The State Showed Probable Cause Under the Totality of the Circumstances.*

K.S.A. 2019 Supp. 21-5222(b) establishes a two-prong test to determine if a person justifiably used deadly force. The first prong is subjective and "requires a showing that the defendant sincerely believed it was necessary to kill to prevent imminent death or great bodily harm to the defendant or a third person." *Thomas*, 311 Kan. at 410. The second prong is objective and "requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary to prevent imminent death or great bodily harm to the defendant or a third person." 311 Kan. at 410-11.

K.S.A. 2019 Supp. 21-5226 limits a defendant's claim of justified use of force in certain circumstances. That statute provides, in relevant part, that a claim of self-defense is unavailable if the defendant:

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(c) otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." K.S.A. 2019 Supp. 21-5226(b) and (c).

24

Subsections (b) and (c) set forth different grounds for denying self-defense immunity when an individual initially provokes the use of force. Under subsection (b), an individual may not claim self-defense if he or she initially provokes the use of force "with intent to use such force as an excuse to inflict bodily harm." Under subsection (c), an initial aggressor may still claim self-defense if one of the retreat "safe harbor" exceptions applies, and the aggressor did not initially provoke the use of force with the intent to use such force as an excuse to inflict bodily harm on the assailant. *Thomas*, 311 Kan. at 411.

To defeat a defendant's immunity motion, then, the State may show probable cause that the "defendant's use of force was not justified under either or both of two scenarios: (1) the defendant did not honestly believe the use of force was necessary under the circumstances, or (2) a reasonable person would not believe the use of force was necessary under the circumstances." *Thomas*, 311 Kan. at 412. In this context, "[p]robable cause simply means that the district court's factual findings are sufficient for a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of defendant's guilt despite the defendant's claim of justified use-of-force immunity." *Thomas*, 311 Kan. at 412-13. The State's probable cause burden at this stage is substantially less than its burden of proof to obtain a conviction, which requires proof of guilt beyond a reasonable doubt. 311 Kan. at 412.

When applicable, the State may also overcome a defendant's pretrial immunity motion by showing probable cause that the defendant initially provoked the use of force under the circumstances listed in K.S.A. 2019 Supp. 21-5226(b) or (c). If the State can establish probable cause that the defendant initially provoked the use of force, "it would not be necessary to consider the two-part subjective and objective test under K.S.A. 2019 Supp. 21-5222." *Thomas*, 311 Kan. at 411-12.

Based on the evidence presented at the immunity hearing, we find the State showed probable cause that (1) Phillips initially provoked the use of force making self-defense immunity unavailable under K.S.A. 2019 Supp. 21-5226(b) and (c); and (2) Phillips' use of deadly force was not justified under the two-part subjective and objective test under K.S.A. 2019 Supp. 21-5222.

Phillips testified at the hearing that someone at the party threatened him with a gun, but other witnesses called Phillips' claim into doubt. Detective Hollyfield testified Phillips never said anything in his initial police interview about seeing a gun at the party. Hooper also said that no one at the party had any kind of weapon. This evidence impugns Phillips' credibility and suggests Phillips created this story after the fact to justify the shooting.

After returning home from the party, Phillips' first Facebook message to Rotramel was "i hope you have better plans cuz ill break your legs when i see you. fuck off you coward faggot." Over the next hour, Phillips sent Rotramel over 40 similarly inflammatory messages, compared to Rotramel's 8 responses. Phillips' numerous aggressive messages support a reasonable inference that Phillips was trying to provoke Rotramel to violence. These messages also undermine Phillips' claim that he was scared the people at the party would follow him home and attack him, particularly his message ordering Rotramel to "bring all 4 of the people wantint [*sic*] to start shit." Moreover, Phillips' messages all suggest he was extremely agitated and intended to physically harm Rotramel when he returned home. His last message telling Rotramel to "come home" was sent just nine minutes before the 911 call reporting the shooting. This supports a reasonable inference that Phillips' state of mind and heightened state of anger remained unchanged at the time of the shooting.

Further, investigators found a box of 12-gauge shotgun shells next to the computer Phillips was using to send his provocative messages to Rotramel, including a message

26

that Phillips was "loaded ready to go cuz." Several shells were missing from the box, and matching shell casings were found on the patio where both victims were shot. This evidence supports a reasonable inference that Phillips was already planning to shoot Rotramel before Rotramel returned to the house, and he was not acting in self-defense. This inference is further supported by the absence of any verbal threats or physical altercation before Phillips shot Rotramel and Hooper.

The evidence also supports a reasonable inference that Phillips knew Rotramel was one of the people approaching him. The testimony of Hooper, Teresa, and forensic investigator Morland support a finding that the lighting conditions would have enabled Phillips to identify Rotramel and Hooper. Hooper testified that he and Rotramel also identified themselves and yelled, "Don't shoot," as they approached the house. Teresa corroborated this testimony, noting that she heard yelling coming from in front of the house after Phillips' initial warning shot woke her up and that she saw someone walking up the driveway when she went outside. Moreover, Detective Hollyfield testified Phillips had told his neighbor he shot two people and one of them was Rotramel.

Phillips' own testimony also casts doubt on his claim that he did not know who he was shooting. Phillips claimed the poor lighting conditions prevented him from identifying Rotramel and Hooper when they were less than 15 feet away. But he also claimed he was able to see someone waving a gun out the window of Hooper's car, even though the road was approximately 145 feet from the house. He also later claimed that after shooting the victims, he saw two other people get out of the car and could tell neither of them was Rotramel. His claims that he could recognize people and objects from a distance well over 15 feet is inconsistent with his claim that he could not identify Rotramel and Hooper from a few feet away.

Considering the totality of the circumstances, as established by the evidence at the hearing and reasonable inferences drawn from that evidence, a person of ordinary

27

prudence and caution could conscientiously entertain a reasonable belief that Phillips initially provoked Rotramel's use of force with the intent to use such force as an excuse to inflict bodily harm upon Rotramel and Hooper, rendering a claim of self-defense immunity unavailable to Phillips. See K.S.A. 2019 Supp. 21-5226(b). Likewise, a person of ordinary prudence and caution could conscientiously entertain a reasonable belief that Phillips initially provoked Rotramel's use of force and neither of the retreat safe harbor exceptions under K.S.A. 2019 Supp. 21-5226(c) applied. And while it is unnecessary to consider the two-part test under K.S.A. 2019 Supp. 21-5222 given probable cause that Phillips was the initial aggressor under K.S.A. 2019 Supp. 21-5226, we note that under the totality of the circumstances, a person of ordinary prudence and caution could conscientiously entertain a reasonable belief that Phillips did not believe the use of deadly force was necessary under the circumstances, and a reasonable person would not believe the use of deadly force was necessary under the circumstances. For these reasons, Phillips was not immune from prosecution under K.S.A. 2019 Supp. 21-5231.

*The District Court Properly Denied Phillips' Request for a Lesser Included Offense Instruction to the Aggravated Battery Charge.*

Next, Phillips argues the district court erred in declining to give a lesser included offense instruction for his aggravated battery charge. The State charged Phillips with level 4 aggravated battery under K.S.A. 2017 Supp. 21-5413(b)(1)(A). Level 4 aggravated battery is defined as "[k]nowingly causing great bodily harm to another person or disfigurement of another person." K.S.A. 2017 Supp. 21-5413(b)(1)(A). At trial, the district court gave an instruction stating the jury could convict Phillips if he "knowingly caused great bodily harm to Kristofer Hooper."

The district court also gave an instruction on the lesser included offense of level 7 aggravated battery under K.S.A. 2017 Supp. 21-5413(b)(1)(B). Level 7 aggravated battery under subsection (b)(1)(B) is defined as "knowingly causing bodily harm to

28

another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2017 Supp. 21-5413(b)(1)(B). The district court's instruction told the jury it could convict Phillips if he "knowingly caus[ed] bodily harm to Kristofer Hooper in any manner whereby great bodily harm, disfigurement or death can be inflicted."

At the jury instruction conference, Phillips also requested a jury instruction on the lesser included offense of level 7 aggravated battery under K.S.A. 2017 Supp. 21-5413(b)(1)(C). Level 7 aggravated battery under subsection (b)(1)(C) is defined as "knowingly causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2017 Supp. 21-5413(b)(1)(C). Phillips' requested instruction would have told the jury it could convict Phillips if he "knowingly caus[ed] physical contact in a rude, insulting, or angry manner with a deadly weapon." The State argued the instruction would be inappropriate because it "adds an element of a deadly weapon, which is not included in the original charge." The district court agreed with the State and declined to give the instruction.

*Standard of Review and Legal Framework*

We use a four-step process to review jury instruction challenges:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and

29

degree of certainty set forth in [*State v. ]Ward*." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

*Analysis of the Jury Instruction Issue*

The record shows Phillips requested an instruction on the lesser included offense of level 7 aggravated battery under K.S.A. 2017 Supp. 21-5413(b)(1)(C). Thus, Phillips has preserved this issue for review.

Next, we determine whether Phillips' requested instruction was legally appropriate. In general, a jury instruction on a lesser included offense is legally appropriate. A lesser included offense includes a "'lesser degree of the same crime.'" *State v. Gentry*, 310 Kan. 715, 721, 449 P.3d 429 (2019). "'[L]evel 7 aggravated battery is a lesser included offense of level 4 aggravated battery.'" *State v. Williams*, 295 Kan. 506, 521, 286 P.3d 195 (2012). While *Williams* addressed a prior version of the aggravated battery statute, the only substantial change to aggravated battery as defined in subsection (b)(1) is lowering the culpable mental state from "intentionally" to "knowingly." Compare K.S.A. 21-3414(a)(1) with K.S.A. 2017 Supp. 21-5413(b)(1).

Even though level 7 aggravated battery is a lesser included offense of level 4 aggravated battery, the State objected to the requested instruction, arguing the instruction added the element of "with a deadly weapon." Both parties interpret the State's objection as an argument that the instruction was impermissibly overbroad. Generally, a jury instruction on the elements of a crime that is broader than the charged crime is erroneous. *State v. McClelland*, 301 Kan. 815, Syl. ¶ 4, 347 P.3d 211 (2015). The charging document sets out the specific offense alleged to inform the defendant of the nature of the

30

accusation, to permit the development of a defense to meet that accusation, and to protect against conviction based on facts not contemplated in the accusation. 301 Kan. 815, Syl. ¶ 4. Accordingly, the State is bound by the wording of its charging document. 301 Kan. 815, Syl. ¶ 4. And if a jury instruction on the elements of a crime adds alternate statutory elements that were not contained within the language of the complaint or information charging the defendant with the crime, the instruction is overly broad and, thus, erroneous. 301 Kan. 815, Syl. ¶ 5. The same rationale applies when evaluating an overbreadth challenge to a proposed lesser included offense instruction. Compare *State v. Charles*, 304 Kan. 158, 166-67, 372 P.3d 1109 (2016) (applying legal framework to analysis of lesser included offense instruction), *abrogated on other grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017), with *State v. Crosby*, 312 Kan. ___, ___ P.3d ___ (No. 119,824, this day decided), slip op. at 12-15 (applying same legal framework in analyzing overbreadth challenge to district court's elements instruction for charged offense). Thus, generally, it is not legally appropriate to instruct the jury on a lesser included offense when the elements are broader than the charged crime.

On appeal, Phillips argues the requested instruction was not overbroad. According to Phillips, a level 4 aggravated battery charge requires the State to show the defendant caused great bodily harm, but the State need not show the defendant caused that harm through a particular type of contact. In contrast, level 7 aggravated battery under subsection (b)(1)(C) requires the State to show a specific type of touching—that is, physical contact with a deadly weapon. Phillips reasons that the requested instruction would thus have been narrower than the charged offense.

The State contends the instruction is impermissibly overbroad but not for the reason argued before the district court. At the instructions conference, the State objected to the requested instruction because it added the element of "with a deadly weapon." However, on appeal, the State argues the instruction is overbroad because bodily harm

31

and physical contact are not the same. According to the State, allowing the jury to convict Phillips of causing physical contact with Hooper would have expanded the charged offense.

We are not persuaded by the State's argument that Phillips' requested instruction would have been impermissibly overbroad. In making this argument, the State relies on *Charles*, 304 Kan. 158. There, the State charged Charles with aggravated battery, and the complaint alleged Charles intentionally caused bodily harm with a deadly weapon, specifically his SUV. At trial, the district court gave an instruction telling the jury it could convict Charles of intentional aggravated battery if Charles caused bodily harm to the victim with his SUV. But the district court also gave an instruction on the lesser included offense of reckless aggravated battery which told the jury it could convict if Charles caused bodily harm to the victim with his SUV "*or in any manner whereby great bodily harm, disfigurement or death can be inflicted.*" *Charles*, 304 Kan. at 162.

On review, we held that the instruction on the lesser included offense of reckless aggravated battery was impermissibly overbroad because it expanded the breadth of the *actus reus* when compared to the *actus reus* specified in the complaint. 304 Kan. at 167-69. We explained,

> "The State was not required to be as specific as it was in its aggravated battery charge
> against Charles. It need not have alleged that Charles committed severity level 7
> intentional aggravated battery only by causing bodily harm to [the victim] by using his
> SUV as a deadly weapon. But, having chosen that path, it assumed the burden of proving
> the elements of exactly it or its lesser included reckless version beyond a reasonable
> doubt. The district judge erred by expanding the lesser included instruction so that
> Charles could be convicted if the jury found beyond a reasonable doubt that he inflicted
> bodily harm on [the victim] 'in any manner whereby great bodily harm, disfigurement or
> death can be inflicted.' The lesser included offense instruction was neither factually nor
> legally appropriate." 304 Kan. at 168-69.

32

*Charles* provides little guidance in resolving this issue because it is distinguishable from the present case. The State charged Charles with level 7 aggravated battery, which lists options within a means for committing the offense. See *Ultreras*, 296 Kan. at 854 (holding "'with a deadly weapon'" and "in a 'manner whereby great bodily harm, disfigurement or death can be inflicted'" are options within a means). The charging document in *Charles* only listed one of these options, thus limiting the State to proving that option. The given instruction was thus impermissibly overbroad because it instructed the jury on an option for committing the offense that was not set out in the charging document and that option broadened the *actus reus* of the crime.

In contrast, the State charged Phillips with level 4 aggravated battery. Unlike level 7 aggravated battery, level 4 aggravated battery does not list options within a means for committing the offense. Accordingly, the complaint alleged only that Phillips "unlawfully and knowingly cause[d] great bodily harm to another person or disfigurement of another person, to-wit:  [Hooper]." This allegation required the State to prove Phillips caused great bodily harm, but, unlike the complaint in *Charles*, it did not limit the State to proving one manner of causing such harm over another.

The State also relies on *State v. O'Connor*, No. 118,519, 2019 WL 1868327 (Kan. App. 2019) (unpublished opinion). There, the State charged O'Connor with committing aggravated battery by "'knowingly caus[ing] physical contact'" with the victim. 2019 WL 1868327, at *2. At trial, the district court instructed the jury on this offense. But it also instructed the jury that it could convict if O'Connor "recklessly caused bodily harm" to the victim. 2019 WL 1868327, at *2. The Court of Appeals held the district court erred in giving an instruction on recklessly causing bodily harm because it was broader than the charged offense. The panel explained "[c]harging O'Connor with making physical contact did not put her on notice that she could be convicted of causing bodily harm; 'bodily

33

harm' ostensibly requires more evidence to prove than mere 'physical contact.'" 2019 WL 1868327, at *6.

*O'Connor* provides little support for the State's argument because Phillips' situation is the inverse of that addressed in *O'Connor*. The State charged Phillips with causing bodily harm, but Phillips requested an instruction on causing physical contact. The *O'Connor* panel acknowledged "a complaint alleging 'bodily harm' likely puts a defendant on notice that they could be found guilty by way of 'physical contact' because the physical contact of aggravated battery is likely a necessary precursor of the bodily harm." 2019 WL 1868327, at *6. Indeed, bodily harm has been defined as "'"any touching of the victim against [the victim's] will, with physical force, in an intentional hostile and aggravated manner."'" *State v. Whitaker*, 260 Kan. 85, 93, 917 P.2d 859 (1996), *disapproved of on other grounds by State v. Brice*, 276 Kan. 758, 80 P.3d 1113 (2003); see PIK Crim. 4th 54.310, Comment.

While the State has focused its argument on appeal on whether "physical contact" is broader than "bodily harm," we note that the State objected to Phillips' requested instruction because it would have added the element of "deadly weapon." This rationale was the basis for the district court's ruling that the instruction was not legally appropriate. However, this rationale is also erroneous.

The complaint in Phillips' case alleged that he "cause[d] great bodily harm . . . or disfigurement . . . [to Hooper]." The evidence needed to show Phillips caused great bodily harm or disfigurement would ostensibly also show Phillips acted "in any manner whereby great bodily harm, disfigurement or death can be inflicted." The phrase "with a deadly weapon" in the aggravated battery statute describes a specific way a defendant may cause physical contact or bodily harm "in a 'manner whereby great bodily harm, disfigurement or death can be inflicted.'" *Ultreras*, 296 Kan. at 854; see *State v. Colbert*, 244 Kan. 422, 426, 769 P.2d 1168 (1989) (defining "deadly weapon" in context of

34

aggravated battery statute as "'an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury'"). Thus, the charging document would have put Phillips on notice that he may have to defend against a claim that he acted "in a manner whereby great bodily harm, disfigurement or death can be inflicted," which would include, but not be limited to, a claim that he acted with a deadly weapon. As a result, an instruction requiring the State to prove Phillips used a deadly weapon would not have been impermissibly overbroad because it would require the State to prove Phillips committed aggravated battery in a specific manner rather than simply proving he caused great bodily harm in any manner, as set forth in the complaint. See *State v. Seck*, No. 110,786, 2015 WL 1401954, at *5 (Kan. App. 2015) (unpublished opinion) (finding instruction which allowed jury to convict defendant of aggravated battery for causing bodily harm "with a deadly weapon" or "'in any manner whereby great bodily harm, disfigurement, or death can be inflicted'" was not overbroad when compared to charge that defendant caused bodily harm only "'in any manner whereby great bodily harm, disfigurement, or death can be inflicted'").

In sum, Phillips' requested instruction was not impermissibly overbroad based on the charging document in his case. Phillips was charged with "knowingly caus[ing] great bodily harm . . . or disfigurement." This charge did not limit the State to proving one manner of causing such harm over another. Additionally, to prove Phillips caused bodily harm to Hooper, the State would need to show that Phillips made physical contact with Hooper. Accordingly, the charging document was sufficient to put Phillips on notice that the State may introduce evidence to establish he made physical contact with Hooper "in any manner whereby great bodily harm, disfigurement or death can be inflicted," thus allowing Phillips to develop a defense. Therefore, the district court's rationale for finding the instruction legally inappropriate is incorrect as is the State's modified argument on appeal.

35

Even if the district court erroneously concluded that Phillips' requested instruction was not legally appropriate, the court's failure to give the instruction will only amount to error if the instruction was also factually appropriate. "An instruction on a lesser included crime is factually appropriate if there is '"sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction."'" *State v. Becker*, 311 Kan. 176, 183, 459 P.3d 173 (2020). For Phillips' requested instruction to be factually appropriate, there must be evidence from which the jury could have concluded that Phillips caused only physical contact with Hooper without causing bodily harm.

Reviewing the evidence, though, Hooper's bodily harm was uncontested. Hooper testified he suffered a gunshot wound to the hip. He spent three days in the hospital and underwent surgery for the wound. At the time of trial, he still had 50 to 60 BBs in his body, and he continued to wake up in pain every morning. The State presented photographs of Hooper's hip wound as well as the bloody stain Hooper left on the passenger seat of his car on his way to the hospital. Phillips presented no evidence to contest the existence or extent of Hooper's injuries. Thus, there is nothing in the record to suggest Phillips made only physical contact with Hooper without causing bodily harm.

As a result, the requested instruction was not factually appropriate, so the district court did not err in failing to give the instruction. While the district court may have relied on a different rationale in declining to give the instruction, we affirm the district court as right for the wrong reason. See *State v. Ryce*, 303 Kan. 899, 964, 368 P.3d 342 (2016) (appellate court can affirm the district court if court was right for wrong reason). Because the district court did not err in declining to give Phillips' requested instruction, our analysis stops here, and we need not proceed to the last step in the analysis—addressing harmlessness.

*The District Court Did Not Err in Denying Phillips' Motion for New Trial.*

Finally, Phillips argues the district court erred in denying his motion for a new trial based on ineffective assistance of counsel. While Phillips raised numerous claims in his motion, he only raises two on appeal. Thus, our discussion will focus on the facts and arguments relevant to those two claims.

*Supplemental Facts*

Several weeks after trial, Phillips filed a pro se motion "to dismiss Ineffective Counsel." The district court liberally construed the motion as a motion for new trial based on ineffective assistance of counsel and set a hearing on the motion. The district court also appointed new counsel to represent Phillips.

Phillips' new counsel filed an amended motion for a new trial. Among the many allegations in that motion, Phillips claimed his trial counsel, Mark Orr, "improperly applied the immunity statutes in his motion, causing the Court to rule on presumptions that were not applicable; Phillips alleges that this was due to Orr not properly researching the issue prior to hearing." Phillips also claimed Orr had him sign a continuance order before a new trial date had been set, and "Phillips did not realize he was agreeing to a 3 month continuance at that point in time, and did not consent to such a lengthy delay of the trial."

At the hearing, Phillips testified Orr's immunity motion cited statutory presumptions regarding self-defense claims, but Phillips had wanted to pursue a "stand-your-ground" defense, making the presumptions inapplicable. Phillips also said he had told the district court that he did not want to delay the proceedings for very long because he had medical problems and he needed to see a real doctor. Orr later came to Phillips with a document to sign to continue the trial. Orr explained the continuance was

necessary to get everything "ironed out." Phillips signed the document, even though it did not have a new trial date on it. Phillips said he remembered the district judge saying that counsel would have to find a mutually agreeable date with the court. But he also assumed that he would be present at the continuance hearing and have a chance to object.

Orr testified Phillips had given him notes on the immunity motion, but Orr drafted the motion that was filed and heard. He believed the motion correctly stated the law regarding self-defense claims. He said the standard for defense of a vehicle, a person, or a house was the same, and Phillips was concerned about shots going into the house where his mother was sleeping.

As for the final trial continuance, Orr said it was the only time he had had a client sign a continuance order that did not have a trial date. He explained he did not want to bring Phillips over from the jail just to hear his new trial date. Orr had explained to Phillips that the trial would be set for the first date that everyone—including co-counsel, the State, and the court—was available. Orr admitted the continuance was longer than Phillips wanted, but he explained everyone had had a full schedule.

The district court denied Phillips' motion. It denied his claim regarding the immunity motion without comment. As for the continuance order, it found Phillips knew the order did not contain a new trial date. The district court also found Phillips knew that the court and counsel would need to agree on a date. It further found Phillips failed to show prejudice. It added that given the other claims Phillips made alleging counsel's inadequate preparation, "I don't know that he would have objected to the continuance . . . if it would have been couched in terms of giving his attorney more time to adequately prepare for a defense and for jury trial."

38

*Standard of Review and Legal Framework*

"'A claim alleging ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. Consequently, appellate courts review the underlying factual findings for support by substantial competent evidence and the legal conclusions based on those facts de novo.'" *State v. Reed*, 302 Kan. 227, 244, 352 P.3d 530 (2015).

To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test identified in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). First, the defendant must show that counsel's performance was deficient under the totality of the circumstances. Second, the defendant must show prejudice—that is, there is a reasonable probability that the jury would have reached a different result but for the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014).

On appeal, Phillips first claims Orr should have objected to or sought clarification of the district court's ruling on the immunity motion. Because this specific claim was not raised below, the district court did not rule on whether Orr was deficient for failing to request clarification of the district court's ruling on the immunity motion. But assuming, without deciding, that counsel's performance was deficient, we find that Phillips cannot establish prejudice based on our resolution of issue I—Phillips was not entitled to statutory immunity. See 300 Kan. at 887 (first considering prejudice prong of ineffective assistance inquiry).

As for Phillips' claim regarding the continuance, the district court correctly concluded Phillips failed to show prejudice. In his brief, Phillips alleges only that the three-month trial delay "subject[ed] him to oppressive pre-trial incarceration." But to prevail on an ineffective assistance of counsel claim, he must show there is a reasonable

probability that counsel's deficient performance affected the verdict. Phillips does not explain how the three-month delay affected the verdict in his case.

In arguing this point, Phillips also alleges his right to be present was violated. He correctly notes that a continuance is a critical stage of trial at which a defendant has a right to be present. *State v. Wright*, 305 Kan. 1176, 1178, 390 P.3d 899 (2017). No one disputes that Phillips was absent when the district court granted a trial continuance in January 2018. This absence would be a violation of Phillips' right to be present at every critical stage unless he knowingly and voluntarily waived that right. *State v. James*, 309 Kan. 1280, 1308-09, 443 P.3d 1063 (2019).

However, the record indicates that Phillips waived his right to be present when the district court granted the trial continuance. The continuance order Phillips signed contained the following language:

"Affirmation of Defendant

"I have been made aware of my rights to a Speedy Trial pursuant to K.S.A. 22-3402. I have been informed that I have a right to be present in Court to object to any continuance requested by my counsel. I hereby agree to the continuance of my Jury Trial to the dates stated above, and waive my right to object to this continuance in open Court. I understand that my counsel will be appearing in Court on my behalf, that the speedy trial statute time will be tolled during the period of this continuance, i.e., the continuance will be charged to the defendant/defense and will not count against the State or Court under the Kansas Speedy Trial Statute. I believe it is in my best interest to waive such right to be present and/or object to the requested continuance."

By signing the continuance order, Phillips waived his right to be present at the hearing.

Furthermore, Phillips has failed to show how his absence at the hearing resulted in any prejudice to him. This is particularly true because defense counsel was requesting the continuance to better prepare for trial. Phillips does not explain how the verdict in his case would have been different if the case had gone to trial three months earlier when defense counsel would ostensibly have been less prepared.

Affirmed.

CLINT B. PETERSON, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  District Judge Peterson was appointed to hear case No. 121,075 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.